[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-14210

_____

D.C. Docket No. 1:20-cv-03702-JPB

RICHARD LEE BROWN,
JEFFREY RONDEAU,
DAVID KRAUSZ,
SONYA JONES,
NATIONAL APARTMENT ASSOCIATION,

Plaintiffs-Appellants,

versus

SECRETARY, U.S. Department of Health and Human Services,
U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,
CHIEF OF STAFF, U.S. Centers for Disease Control and Prevention,
U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(July 14, 2021)

Before BRANCH, GRANT, and TJOFLAT, Circuit Judges.

GRANT, Circuit Judge:

When a district court denies a preliminary injunction, the plaintiffs have a choice: they can appeal the denial, or they can proceed with trying the case on the merits. If they choose to appeal, they often face an uphill battle. Rather than just persuade the judge on the merits, the plaintiffs must show that they are likely to suffer an irreparable injury without a preliminary injunction, that the balance of the equities tips in their favor, and that a preliminary injunction would not be adverse to the public interest. Because the plaintiffs here have failed to establish at least one of those requirements—irreparable injury—we affirm.

## I.

In March 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020). In the CARES Act, Congress, among other things, imposed a 120-day moratorium on evictions for rental properties receiving federal assistance. *See* 15 U.S.C. § 9058. After Congress's moratorium expired on July 25, 2020, the President directed the Secretary of the Department of Health and Human Services and the Director of the Centers for Disease Control and Prevention to "consider whether any measures temporarily halting residential evictions of any tenants for failure to pay rent are reasonably necessary" to prevent the interstate spread of COVID-19. Fighting the Spread of COVID-19 by Providing Assistance to Renters and Homeowners, Exec. Order No. 13,945, 85 Fed. Reg. 49,935, 49,936 (Aug. 8, 2020).

To that end, the CDC issued a temporary eviction moratorium on September 4, 2020, that suspended the execution of eviction orders for nonpayment of rent. *See* Temporary Halt in Residential Evictions to Prevent the Further Spread of

2

COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020).  The CDC pointed to 42 U.S.C. § 264 as providing a statutory basis for its order.  That section grants the Surgeon General authority to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from . . . one State or possession into any other State or possession."[1]  42 U.S.C. § 264(a).  And it states that, for "purposes of carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary."  *Id.*

The CDC's order "does not relieve any individual of any obligation to pay rent," but it does prohibit any landlord from evicting "any covered person" from a residential property for nonpayment of rent while the order is in effect.  Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. at 55,292.  To qualify as a "covered person" who can benefit from the eviction moratorium, a tenant must provide her landlord an "executed copy" of a declaration.  *Id.* at 55,293.  The declaration requires that the tenant attest to several provisions.  First, that she has "used best efforts to obtain all available government assistance for rent or housing."  *Id.* at 55,297.  Second, that she meets one of

---

[1] The statute grants regulatory authority to the Surgeon General, but these powers were transferred to what is now the Secretary of Health and Human Services.  *See* Reorganization Plan No. 3 of 1966, 31 Fed. Reg. 8855 (June 25, 1966); 20 U.S.C. § 3508(b).  The Secretary, in turn, conferred authority on the Director of the CDC.  *See* 42 C.F.R. § 70.2.

several income qualifications, including that she expects to earn "no more than $99,000" in 2020 (or $198,000 if she files a joint tax return). *Id.* Third, that she is "unable to pay [her] full rent" due to "substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses." *Id.* (footnote omitted). Fourth, that she is "using best efforts to make timely partial payments," taking into account "other nondiscretionary expenses." *Id.* Fifth, she must attest that, if evicted, she "would likely become homeless, need to move into a homeless shelter, or need to move into a new residence shared by other people who live in close quarters because [she has] no other available housing options," which are defined as "available, unoccupied residential property" that would comply with occupancy standards and "not result in an overall increase of housing cost" for her. *Id.* Sixth, that she understands that she "must still pay rent or make a housing payment" and that "fees, penalties, or interest for not paying rent or making a housing payment on time" may still be charged. *Id.* And seventh, that she understands that when the eviction moratorium expires, her "housing provider may require payment in full for all payments not made prior to and during" the moratorium. *Id.*

The CDC's order was originally set to expire on December 31, 2020. *Id.* at 55,292. But days before the deadline, Congress enacted the Consolidated Appropriations Act, which extended the CDC's order through January 31, 2021. *See* Pub. L. No. 116-260, § 502, 134 Stat. 1182, 2079 (2020). On January 29, the CDC extended the order again, this time through March 31, 2021. *See* Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 86 Fed.

4

Reg. 8020 (Feb. 3, 2021).  And as the March deadline approached, the CDC

extended its order through June 30, 2021.  *See* Temporary Halt in Residential

Evictions to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 16,731 (Mar.

31, 2021).  Finally, on June 24, 2021, the CDC pushed the order's expiration date

back yet again, this time until July 31, 2021.  *See* Temporary Halt in Residential

Evictions to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 34,010 (June

28, 2021).

The plaintiffs here are several landlords seeking to evict their tenants for

nonpayment of rent and a trade association for owners and managers of rental

housing.  In September 2020, they filed a complaint challenging the CDC's

eviction moratorium.  Their amended complaint alleges, among other things, that

the CDC's order exceeds its statutory and regulatory authority, is arbitrary and

capricious, and violates their constitutional right to access the courts.  They then

moved for a preliminary injunction, which the district court denied.  This is their

appeal.

## II.

We review the district court's decision to deny a preliminary injunction for

abuse of discretion, though "we review and correct errors of law without deference

to the district court."  *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1129

(11th Cir. 2005).

## III.

A preliminary injunction is an "extraordinary remedy never awarded as of

right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Indeed, the

grant of a preliminary injunction is "the exception rather than the rule." *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983). To get one, a party must show: (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable harm without a preliminary injunction; (3) that the threatened injury to the party outweighs any harm that might result to the defendants; and (4) that an injunction is not adverse to the public interest. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990); *Winter*, 555 U.S. at 20. The plaintiff bears the "burden of persuasion" on each of these four factors. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (quotation omitted). Because the government is the party opposing a preliminary injunction here, "its interest and harm merge with the public interest," so we may consider the third and fourth factors together. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020).

We have doubts about the district court's ruling on the first factor: whether the plaintiffs are likely to succeed on the merits. The only statutory basis the government identifies for the CDC's order is 42 U.S.C. § 264(a). At first glance, that provision could be read to vest the CDC with general authority to enact any and all regulations that "are necessary to prevent the introduction, transmission, or spread of communicable diseases" between states. 42 U.S.C. § 264(a). Indeed, the government was unwilling to articulate any limits to the CDC's regulatory power at oral argument. But in the very next sentence, Congress specified the means that the CDC can use to carry out that authority: the "inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found

6

to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." *Id.* In other words, the second sentence of § 264(a) appears to clarify any ambiguity about the scope of the CDC's power under the first.

In any event, despite our doubts, we need not consider or resolve the scope of the CDC's statutory authority. A preliminary injunction requires more than a likelihood of success on the merits—much more. *See Siegel*, 234 F.3d at 1176 (a preliminary injunction will not be granted unless the movant "clearly established" all four "prerequisites" (quotation omitted)); *see also Snook v. Tr. Co. of Ga. Bank of Savannah, N.A.*, 909 F.2d 480, 486 (11th Cir. 1990) ("The plaintiff's success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm." (quoting *Ne. Fla. Chapter*, 896 F.2d at 1285)). After all, the purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Lambert*, 695 F.2d at 539 (quotation omitted). So a preliminary injunction is meant to keep the status quo for a merits decision, not to replace it.[2]

Because the landlords here have chosen to seek a preliminary injunction, they must show that, among other things, they are likely to suffer an irreparable injury during the pendency of their lawsuit absent a preliminary injunction. *See Ne. Fla. Chapter*, 896 F.2d at 1285; *see also U.S. Army Corps of Eng'rs*, 424 F.3d

---

[2] Though parties often fail to appreciate this fact in the flush of litigation, the more efficient path to mitigating their harm is often to move forward with the merits of the litigation rather than appeal the denial of a preliminary injunction. *Lambert*, 695 F.2d at 540; *see also Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) (Wilkinson, J.).

at 1133–34.  Possibility of an irreparable injury is not enough.  *See Winter*, 555 U.S. at 22.  Indeed, issuing a preliminary injunction "based only on a *possibility* of irreparable harm" would be "inconsistent" with treating a preliminary injunction as an "extraordinary remedy."  *Id.* (emphasis added).  And the burden is on the plaintiffs to show that injury—we cannot rely on our own intuition about how things will play out.  *Siegel*, 234 F.3d at 1176.

The landlords say that they are suffering three irreparable injuries.  *First*, they say that the CDC's order is unconstitutional—that it "exceeds the limited grant of authority Congress bestowed on CDC" and "illegally deprives the [landlords] of their constitutionally-guaranteed access to the courts."  According to the landlords, these "intangible" constitutional injuries are irreparable.  *Second*, the landlords say that they have been "wrongfully deprived of access to their unique property" and that this too constitutes an irreparable injury.  *Third*, the landlords assert that they will never recover the unpaid rent because their tenants are necessarily "insolvent."  None of these asserted injuries satisfies the strict standard for irreparable harm.

We start with the landlords' first argument: that the violation of their constitutional rights constitutes an irreparable injury.  This argument finds no support in our precedents.  In fact, those precedents cut the other way.  In *Siegel v. LePore*, this Court, sitting en banc, rejected the notion that the "violation of constitutional rights always constitutes irreparable harm."  234 F.3d at 1177.  Instead, we identified only two categories of constitutional claims that presumably cause irreparable injuries—certain First Amendment and right-of-privacy claims.

8

*Id.* at 1178; *see also Ne. Fla. Chapter*, 896 F.2d at 1285 (same).  But this case involves neither the First Amendment nor the right of privacy—the damage is "chiefly, if not completely, economic."  *Ne. Fla. Chapter*, 896 F.2d at 1286.  Finding an irreparable injury based on this kind of violation, then, would stretch our precedents.  We decline that invitation.

Next, the landlords argue that they are suffering an irreparable injury because they have been "deprived of access to their unique property."  They say that being temporarily deprived of their property is a "*per se* irreparable injury."  This argument also misses the mark.  Some interferences with real property interests undoubtedly constitute irreparable injuries.  For example, when a party threatens to foreclose on or take another's real property, courts often deem that an irreparable injury.[3]  *See, e.g.*, *Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*, 840 F.2d 653, 661 (9th Cir. 1988) (threatened foreclosure); *Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999) (eminent domain).  Likewise, we have said that wrongfully ejecting a person from her residence constitutes an irreparable injury.  *See Johnson v. U.S. Dep't of Agric.*, 734 F.2d 774, 789 (11th Cir. 1984).  But we have never crafted a per se rule that any interference with an interest in real property is irreparable.[4]  And without

---

[3] Contrary to the district court's assertion, one plaintiff stated that he would be "at risk of foreclosure" if the eviction moratorium continued.  But because his tenant has since vacated the property, that plaintiff's harms are no longer a live issue in the case.

[4] One unbriefed issue that would further complicate this inquiry is whether and to what extent the landlords voluntarily gave up the right to access their properties in their lease agreements, and the extent to which nonpayment affects or does not affect that aspect of the agreements under state law.

more, we fail to see how the temporary inability to reclaim rental properties constitutes an irreparable injury.

Finally, we consider the landlords' argument that their injury is irreparable because their tenants are "insolvent" and will not be able to repay their debts. As a general rule, courts refuse to issue preliminary injunctions when an "adequate alternate remedy" is available, such as "money damages or other relief." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2013) (footnote omitted). Our Circuit is no different. We have said that the "possibility that adequate compensatory or other corrective relief will be available at a later date" weighs "heavily against a claim of irreparable harm." *Ne. Fla. Chapter*, 896 F.2d at 1285 (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)); *see also United States v. Jefferson County*, 720 F.2d 1511, 1520 (11th Cir. 1983).

The landlords acknowledge this general rule and concede that their asserted injury is "economic." But they nonetheless contend that collectability concerns can render an economic injury irreparable. True enough. In "extraordinary circumstances," concerns about collectability can "give rise to the irreparable harm necessary for a preliminary injunction." 11A Wright, Miller & Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2013). We recognized that possibility in *United States v. Askins & Miller Orthopaedics, P.A.*, reasoning that "the collectability of a future money judgment" is "relevant in determining whether legal remedies are adequate" for preliminary-injunction purposes. 924 F.3d 1348, 1359 (11th Cir. 2019) (quotation omitted).

10

In *Askins & Miller*, the IRS sought to collect unpaid employment taxes from a "serial employment-tax delinquent." *Id.* at 1351. After seven years of failed attempts, the IRS sued the company and sought a preliminary injunction to "prevent Askins & Miller from incurring further tax liabilities while the litigation was still ongoing." *Id.* at 1353. It attached a declaration to its motion for a preliminary injunction, which detailed the IRS's lengthy attempts to recover the unpaid taxes: meeting with the company "at least 34 times"; serving levies on "approximately two dozen entities," most of which indicated that no funds were available; and entering into two failed installments agreements.[5] *Id.* at 1352. The declaration also described the IRS's discovery of the company's affirmative attempts to "hide" its funds. *Id.* Given that substantial evidence, we concluded that the record "amply" demonstrated that "in all likelihood, the government [would] never recoup [its] losses." *Id.* at 1360.

In sharp contrast to the detailed evidence provided in *Askins & Miller*, the landlords here gave us little to go on. The only evidence the landlords provided—the CDC declaration—is a flimsy basis for drawing the necessary conclusions about a tenant's ability to pay *after* the moratorium as opposed to *during* the moratorium. In relevant part, that declaration requires a tenant to attest that her income does not exceed the limits set in the order; that because of loss of income, loss of work, or extraordinary medical expenses she cannot pay rent; that she has used "best efforts" to make timely partial payments; and that if she were evicted

---

[5] The measures cited in *Askins & Miller* are not a checklist for every plaintiff who seeks to show irreparable injury from economic harm. Appropriate evidence will always depend on the context of a given case.

11

she would likely become homeless or need to move into a shared-living setting because she has no other "available housing options."  85 Fed. Reg. at 55,297.

These attestations certainly show that the tenants could not afford their rent at the time they were signed.  But they paint a hazy picture—at best—of any given tenant's ability to pay later.  The declaration sheds little light on, among other things, a tenant's educational background, employment history, criminal history, credit history, or rental payment history—factors that would be probative of a tenant's ability to pay after the moratorium is lifted.

Nor have the landlords offered any evidence that the usual tools for collecting on a civil judgment for unpaid rent would be ineffective.  *See Snook*, 909 F.2d at 486.  Consider David Krausz, one of the plaintiffs here.  Krausz is a landlord from South Carolina.  Under South Carolina law, he would have ten years to collect on a civil judgment for unpaid rent against his tenant.  *See* S.C. Code Ann. § 15-3-600.  If his tenant does not voluntarily make payments on the civil judgment, Krausz could attach a levy or lien to her real estate and nonexempt personal property.  *See id.* § 15-19-10; *see also id.* § 15-19-220.  That would include imposing a levy on her "cash and other liquid assets."  *Id.* § 15-41-30(A)(5).  On top of that, most states—but, notably, not South Carolina—permit landlords to garnish wages to recover on a civil judgment against their tenants.  *See id.* § 37-5-104; *see also* Steven L. Willborn, *Wage Garnishment: Efficiency, Fairness, and the Uniform Act*, 49 Seton Hall L. Rev. 847, 852 & n.32 (2019).  The landlords have given us no reason to think that these substantial collection tools would be inadequate.  And the landlords' evidentiary shortcomings are especially

troubling here because they bear the burden of showing that they "clearly established" a likely irreparable injury.  *See Siegel*, 234 F.3d at 1176 (quotation omitted).

The dissent nonetheless contends that the declaration alone satisfies the landlords' burden to establish that their economic injury is likely irreparable.  *See* Dissenting Op. at 78.  We disagree.  Take the fourth condition.  The tenant attested that she has used "best efforts" to make timely partial payments.  85 Fed. Reg. at 55,297.  From this the dissent makes several inferences: that the tenant, for instance, has "no illiquid assets that can be sold" and "no ability to get a loan to cover rental expenses."  Dissenting Op. at 80.  These inferences are not enough to show that a tenant will never be able to repay her landlord.  But they are also unwarranted.  Nothing in the declaration requires that a tenant sell all her possessions or throw herself at the mercy of a payday lender before invoking the eviction moratorium.  "Best efforts" does not mean "every conceivable effort."  Indeed, "best efforts" is "implicitly qualified by a reasonableness test—it cannot mean everything possible under the sun," without regard to consequences.  *Coady Corp. v. Toyota Motor Distribs., Inc.*, 361 F.3d 50, 59 (1st Cir. 2004); *see also, e.g.*, *Permanence Corp. v. Kennametal, Inc.*, 908 F.2d 98, 100 n.2 (6th Cir. 1990); *Equal Emp. Opportunity Comm'n v. R.J. Gallagher Co.*, 181 F.3d 645, 652 (5th Cir. 1999).

Just as a business need not "spend itself into bankruptcy" to comply with a best-efforts clause, a tenant need not render herself destitute before invoking the eviction moratorium.  *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614 (2d Cir.

13

1979).  In other words, a tenant could attest to being unable to make timely payments despite best efforts without first pawning her wedding ring, selling her car, and auctioning off all her other assets.  Indeed, there are many assets that a recently laid-off tenant could own—and continue to own—while affirming that she cannot make timely partial payments despite best efforts.  Without more information, discerning a reasonably accurate picture of a tenant's financial situation based solely on the declaration is akin to playing darts with a blindfold on.

The fifth condition likewise sheds little light.  In that condition, the tenant attested that she would likely have difficulties finding "available, unoccupied residential property . . . that would not result in an overall increase" in housing costs.  85 Fed. Reg. at 55,297.  That makes sense.  After all, the tenant already confirmed that she is unable to pay full rent "due to substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses." *Id.* (footnote omitted).  How many landlords would offer to lease their property to a tenant who is suffering from, for example, a substantial loss of household income?  Common sense tells us that the answer is few.  It should come as no surprise, then, that a tenant would expect to have difficulties securing a new lease on short notice.

But what common sense cannot tell us is what the tenant's financial picture will look like at the end of the moratorium.  After all, despite its potential deficit in statutory authority, the moratorium was designed as a short-term solution to a short-term problem.  Without any information about a tenant's financial or

14

employment picture, we have no way to evaluate whether she will ever be able to repay her landlord; to decide otherwise based solely on the declaration would be to conclude that *no one* who signed the declaration is likely to repay their debts after the moratorium expires. That we cannot do. And it is not enough for us to assume that some tenants will not be able to pay back their landlords—that is almost certainly true. But these landlords must show that *their* tenants are unlikely to repay them.

Given the lack of evidence and the availability of substantial collection tools, we cannot conclude that the landlords have met their burden of showing that an irreparable injury is likely. *See Siegel*, 234 F.3d at 1176. Because the landlords "did not carry the burden as to irreparable harm," we must affirm the denial of a preliminary injunction. *Jefferson County*, 720 F.2d at 1519.

\*    \*    \*

Rather than proceed with trying the case on the merits, the landlords chose to pursue a preliminary injunction on appeal. As a result, they needed to win on more than just the merits. Because they failed to show that they are likely to suffer an irreparable injury, we **AFFIRM** the district court's order denying a preliminary injunction.

TJOFLAT, Circuit Judge, concurring:

In order to obtain a preliminary injunction, a plaintiff must establish four prerequisites: "(1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983). If *any one* of these prerequisites is not satisfied, a district court may not issue the injunction. *See id.* Though I concur in the majority opinion, I write separately to shed additional light on why plaintiffs have failed to establish one of these prerequisites—irreparable harm.

My concurrence proceeds in three parts. First, I'll briefly recap some key provisions of the CDC's eviction moratorium order. Then, I'll describe the general eviction model, as well as my views on how the plaintiffs—if they actually sought to evict their tenants and recoup unpaid rent—should have proceeded in this case. And finally, I'll explain why the availability of this alternative route—seeking eviction and a judgment for unpaid rent in state court—precludes a finding of irreparable harm.

16

I.

The CDC's eviction moratorium temporarily prohibits the eviction of certain covered persons.  To qualify as a covered person, the tenant must provide their landlord with a declaration stating, under penalty of perjury, that: (1) "[t]he individual has used best efforts to obtain all available government assistance for rent or housing"; (2) the individual satisfies some specific income requirements; (3) "the individual is unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses"; (4) "the individual is using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses"; and (5) "eviction would likely render the individual homeless—or force the individual to move into and live in close quarters in a new congregate or shared living setting—because the individual has no other available housing options."  Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292, 55,293 (Sept. 4, 2020) (hereinafter "the Order").

The Order does not, however, "relieve any individual of any obligation to pay rent, make a housing payment, or comply with any other obligation that the individual may have under a tenancy, lease, or similar contract."  *Id.* at 55,294.  In

fact, the Order expressly provides that landlords may charge and collect "fees, penalties, or interest" because of the tenant's failure to pay rent on time, *id.*, and nothing in the Order precludes a landlord from suing their tenant for unpaid rent. The Order also permits evictions in certain circumstances, such as when the tenant engages in criminal activity while on the premises; threatens the health or safety of other residents; damages or poses an immediate and significant risk of damage to property; violates any applicable building code, health ordinance, or other similar regulation relating to health and safety; or violates any other contractual obligation, "other than the timely payment of rent or similar housing-related payment." *Id.*

But perhaps most importantly, nothing in the CDC's Order prevents landlords from initiating a judicial proceeding to have a tenant declared in default and evicted. "Evict," under the Order, is defined only as "any action by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or a possessory action, to remove or cause the removal of a covered person from a residential property." *Id.* at 55,293. While one could plausibly read that definition as precluding a *lawsuit* for eviction, the better reading is that the Order only precludes eviction *as a remedy* during the moratorium.

Consider, for example, the CDC's own guidance on the meaning of "eviction":

18

> The Order is not intended to terminate or suspend the operations of any state or local court. *Nor is it intended to prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the period of the Order*.

CDC, *HHS/CDC Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19: Frequently Asked Questions* 1, https://www.cdc.gov/coronavirus/2019-ncov/downloads/eviction-moratoria-order-faqs.pdf (last accessed June 30, 2021) (emphasis added). This guidance is consistent with the stated intent of the Order. It would make little sense for an eviction moratorium directed at "[m]itigating the spread of COVID-19 within congregate or shared living settings, or through unsheltered homelessness," Order at 55,293, to prevent the mere filing of an eviction proceeding when only the actual removal of tenants presents COVID-19 transmission concerns.

So, looking at the Order and the CDC's guidance, two things become apparent. First, the Order does not prevent landlords from filing a suit that seeks a judgment for their tenants' unpaid rent. And second, the Order does not prevent landlords from *initiating* judicial proceedings that seek their tenants' evictions, so long as the *actual eviction* occurs after the moratorium has expired. Keep both facts in mind going forward.

II.

To understand how the CDC's Order does—and does not—affect evictions as a judicial remedy, let's look at a typical eviction proceeding in the non-Order world.  We'll use plaintiff Brown, a resident of Virginia with a tenant in Virginia, as an example.[1]

To commence the eviction process in Virginia, Brown would serve his tenant with a five-day termination notice pursuant to Virginia Code § 55.1-1245(f).[2]  This notice, in effect, requires the tenant to either pay rent or move out of the property.  *Id.*  If, after five days, the tenant failed to comply with the termination notice, then under Virginia Code § 8.01-126, Brown would provide the General District Court[3] with "a statement under oath of the facts which authorize the removal of the tenant" and would file a Summons for Unlawful Detainer—Virginia's name for a "civil claim for eviction."[4]  The General District Court

---

[1] Of course, eviction proceedings will vary by judge and jurisdiction.  For the sake of simplicity, I describe Virginia's eviction process in very general terms.

[2] Though Virginia Code § 55.1-1245(f) required a fourteen-day termination notice during much of the pandemic, the statute reverted to a five-day notice requirement on July 1, 2021.  *Id.* Because Brown's declaration in support of the motion for preliminary injunction refers to a five-day termination notice, I will do the same.

[3] In Virginia, General District Courts have "exclusive authority to hear civil cases with claims of $4,500 or less and share authority with the [Virginia state] circuit courts to hear cases with claims between $4,500 and $25,000."  *See* Virginia's Judicial System, "General District Court," http://www.courts.state.va.us/courts/gd/home.html (last visited May 26, 2021).

[4] The Summons includes, among other things, information about the property at issue and the amount of unpaid rent the tenant allegedly owes.  *See* Virginia's Judicial System, "Summons

would then issue the Summons and assign a return hearing date (within 30 days of the date of filing the Summons) on which Brown and the tenant may appear. *See id*. at § 8.01-126(b).

At the return hearing, the tenant can either concede the allegations of wrongdoing in the Summons or contest the default. If the tenant contests, the General District Court will set a trial date, and either of the parties may request that the Court order them to file pleadings under Virginia Rule of Supreme Court 7B:2 to delineate the issues for trial. For Brown, this pleading would come in the form of a "Bill of Particulars"—in essence, a more detailed statement of the bases of his claim for eviction. *See* Va. R. Sup. Ct. 7B:2. Likewise, the tenant may be required to file "Grounds of Defense" asserting any affirmative defenses to the eviction. *See id.* If, at trial, the General District Court rejects the tenant's defenses and rules that Brown may legally evict his tenant, the tenant will have ten days to appeal. Va. Code § 8.01-129(a). And once the tenant fails to appeal—or once Brown prevails on appeal—Brown can receive from the General District Court a judgment

---

for Unlawful Detainer (Civil Claim for Eviction)," http://www.courts.state.va.us/forms/district/dc421.pdf. In essence, the Summons functions as a civil complaint.

for possession of the premises and can subsequently request a writ of eviction.[5]

*See id.* at § 8.01-129(b).

How, then, does the plaintiffs' federal lawsuit change this process? Remember, plaintiffs Brown, Rondeau, Krausz, Jones, and the National Apartment Association—all of whom seek to "retak[e] possession of their homes"—filed an amended complaint demanding a "judgment against CDC invalidating CDC's Eviction-Moratorium Order and any other relief that may be appropriate." The amended complaint includes one count that alleges the CDC's Order—on its face—violates the plaintiffs' constitutional right of access to courts, as well as other, separate counts mounting challenges under the "Administrative Procedure Act," the "Supremacy Clause," "Article I, § 1" of the United States Constitution, and the "Tenth Amendment."[6] And the same day they filed their amended

---

[5] At that point, the eviction proceeding falls into the hands of the local sheriff. *See* Va. Code § 8.01-129(b). After the writ of eviction has issued, execution on the writ "should occur within 15 calendar days from the date the writ of eviction is received by the sheriff, or as soon as practicable thereafter, but in no event later than 30 days from the date the writ of eviction is issued." Va. Code § 8.01-470. The sheriff must also give the tenant notice to vacate at least 72 hours before the execution of the writ. *Id.* Once the sheriff executes the writ and evicts the tenant, Brown would be free to repossess his property.

[6] Plaintiffs' amended complaint actually includes eight counts—one claim under an access to courts theory; two claims under the Administrative Procedure Act; one under the Supremacy Clause; one under the Tenth Amendment; one under the Supremacy Clause *and* the Tenth Amendment; one under Article I, § 1 of the Constitution; and one claim alleging an "unlawful suspension of law."

complaint, the plaintiffs also filed a motion for preliminary injunction seeking to "prohibit[] Defendants from enforcing the CDC Order."

Ironically, though, the CDC's Order does nothing to prevent the plaintiffs from pursuing eviction of their tenants. Indeed, the plaintiffs appear to recognize this fact. For example, in his declaration supporting the preliminary injunction motion, Brown concedes that—despite the CDC's Order—he may nevertheless begin eviction proceedings against his tenant pursuant to "legal process in Virginia state courts."[7] So, the CDC's Order serves only to operate as an affirmative defense to eviction for Brown's tenant, not as a total bar to the commencement of eviction proceedings.

Here's how that defense would operate in practice. In a Virginia eviction proceeding, the tenant would present the CDC's Order and an affidavit stating that they are a "covered person" under the Order as an affirmative defense. Brown

---

[7] Brown states that he sought to have the local Sheriff's Office serve a five-day termination notice on his tenant but was told by the Sheriff that the Sheriff's Office would no longer issue and serve termination notices in compliance with a then-existing administrative order by the Supreme Court of Virginia. This is irrelevant, as it appears that Brown himself—rather than the Sheriff—could have served his tenant with the five-day termination notice. Indeed, Virginia law states that the Sheriff "may," but is not obligated to, serve such notices. *See* Va. Code § 55.1-1247.

But even if Brown could not serve the termination notice on the tenant himself, and even if the Sheriff was required to serve the notice but refused, Brown could seek a writ of mandamus compelling the Sheriff to serve the notice. *See, e.g.*, *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1385 (11th Cir. 1998) (en banc) (recognizing that the writ of mandamus is an appropriate remedy to correct the failure to carry out a ministerial task).

would then move to strike the affirmative defense as insufficient under Virginia Code § 8.01-274 on at least two grounds. First, he would claim that the tenant's affidavit is factually inadequate—that is, the tenant is not actually a "covered person" under the Order. And second, he would contend that the CDC's Order is unconstitutional under all of the theories he has asserted in federal court. The Virginia state court would then be required to hash out the constitutionality of the Order and—if it found the Order constitutional—whether the tenant is covered by it.

An injunction issued by the District Court in the plaintiffs' favor does nothing to change that. To start, injunctions bind only "the parties;" "the parties' officers, agents, servants, employees, and attorneys;" and "other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." Fed R. Civ. P. 65(d)(2)(A)–(C). Plaintiffs' tenants are not parties in this case, nor are they in privity with the defendants, and thus they will not be bound by the injunction. *See ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1352 (11th Cir. 2017) ("An injunction may not extend to 'persons who act independently and whose rights have not been adjudged according to law.'" (citing *Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 437, 54 S. Ct. 475, 478 (1934) (citations omitted))). The tenants will thus be free to present the CDC's Order and an affidavit stating that they are "covered" as an affirmative defense in any

24

upcoming eviction proceeding.  And while the state court could take judicial notice

of this Court's decision and the subsequent injunction, they do not bind that court

to any particular result.  *See Doe v. Pryor*, 344 F.3d 1282, 1286 (11th Cir. 2003)

("The only federal court whose decisions bind state courts is the United States

Supreme Court."); *Glassroth v. Moore*, 335 F.3d 1282, 1302 n.6 (11th Cir. 2003)

("[S]tate courts when acting judicially, which they do when deciding cases brought

before them by litigants, are not bound to agree with or apply the decisions of

federal district courts and courts of appeal.").

Put plainly, an injunction issued by the District Court simply allows the

plaintiffs to pursue eviction proceedings in their respective state courts—

something the CDC's Order already permits.  Barring enforcement of the Order

against the plaintiffs does not preclude their tenants from later raising the Order as

a defense to eviction.  So, if the plaintiffs want to evict their tenants, they will need

to litigate the constitutional validity of the CDC's Order in the state courts at some

point.  With or without an injunction.[8]

---

[8] The dissent construes this point as an issue of standing—specifically, as an issue of redressability.  But my concern is whether the plaintiffs have suffered an irreparable harm—or whether they have an adequate remedy at law, *see infra* n.9—not whether they have standing. An injunction should only issue if the district court finds "that certain, immediate, and irreparable injury to a substantial interest of the movant will occur if the application [for the injunction] is denied and the final decree is in his favor."  *Calagaz v. DeFries*, 303 F.2d 588, 589 (5th Cir. 1962).  And a "party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law."  *N. California Power Agency v. Grace*

III.

Keeping in mind that the plaintiffs have been able to sue their tenants for eviction and unpaid rent throughout the pendency of the eviction moratorium, let's turn to the core of this case.  Plaintiffs have alleged three types of irreparable harm. The first, "irreparable constitutional injur[y]," is grounded in the plaintiffs' access to court claim and the notion that the plaintiffs have a "right only to be subject to laws issued by Congress."  The second irreparable harm stems from the plaintiffs' alleged inability to recover from insolvent—that is, "judgment-proof"—tenants. And the third emanates from the deprivation of access to the plaintiffs' leased properties.  I'll consider each in turn.

A.

Plaintiffs contend that the CDC's Order is "unconstitutional in two distinct ways—it unconstitutionally exceeds the limited grant of authority Congress bestowed on CDC, and it illegally deprives the Property Owners of their constitutionally-guaranteed access to the courts."  Because these injuries "are intangible," the plaintiffs argue that they must also be irreparable.  Not so.

---

*Geothermal Corp.*, 469 U.S. 1306, 105 S. Ct. 459 (1984) (Rehnquist, J., in chambers).  Two things follow from these principles.  First, if the issuance of a preliminary injunction does nothing for the plaintiffs, then there was no irreparable harm in the first place.  And second, if the plaintiffs have an adequate remedy at law available in state court, they are not entitled to an injunction in federal court.  *See id.*; *see also infra* n.9.

26

Plaintiffs' first contention—that merely being subjected to a potentially unconstitutional law is categorically an irreparable harm—is a bit befuddling. To start, this Court has rejected the notion that "a violation of constitutional rights always constitutes irreparable harm," *Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000) (en banc) (per curiam), and we have generally cabined our constitutional irreparable injuries to First Amendment violations and right of privacy claims, *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285–86 (11th Cir. 1990). A general grievance that the plaintiffs are being subjected to an unconstitutional law does not fit this mold. The District Court was right to point out that this case "involves neither free speech nor invasion of privacy," and I see no reason that we should stretch irreparable harm to cover the mere assertion that one is being subjected to an unconstitutional law.

In any event, even if the plaintiffs' general constitutional claim presents *some* injury, the plaintiffs have a remedy for it: they can contest the constitutional validity of the CDC's Order in state court. *N. California Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 105 S. Ct. 459 (1984) (Rehnquist, J., in chambers) (considering the availability of remedies in state court when

27

determining whether a movant in federal court has an adequate remedy at law).[9]

As I described in part II, the plaintiffs are free—and have been throughout the

eviction moratorium—to challenge the Order during their state-court eviction

proceedings.  There, the state courts could determine that the CDC's Order is

indeed unconstitutional, and the plaintiffs would afterwards be free to evict their

tenants.[10]

---

[9] In many cases, we analyze whether a movant has suffered an "irreparable harm" and whether the movant lacks an "adequate legal remedy" together.  *See, e.g.*, *Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots*, 770 F.2d 1526, 1528 (11th Cir. 1985) (discussing "irreparable injury to the movant because of the unavailability of an adequate remedy at law").  This makes sense, as "[o]ften times the concepts of 'irreparable injury' and 'no adequate remedy at law' are indistinguishable." *Lewis v. S. S. Baune*, 534 F.2d 1115, 1124 (5th Cir. 1976).  But it is important to note that the two requirements should not always be conflated.  The requirement of an inadequate remedy at law determines whether the movant may pursue *any* equitable relief, and the requirement of an irreparable injury determines whether the movant may pursue *preliminary injunctive* relief.  *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) ("The absence of an adequate remedy at law is a precondition to any form of equitable relief.  The requirement of irreparable harm is needed to take care of the case where although the ultimate relief that the plaintiff is seeking is equitable, implying that he has no remedy at law, he can easily wait till the end of trial to get that relief. . . .  Only if he will suffer irreparable harm—that is, harm that cannot be prevented or fully rectified by the final judgment after trial—can he get a preliminary injunction.").  In this case, it makes no difference whether we analyze the two together or separately, as plaintiffs have shown neither an irreparable harm nor the lack of an adequate remedy at law.

[10] Now, one may respond that a state court's order would not prevent the federal government from prosecuting the plaintiffs for violation of the CDC's Order.  But I find that improbable.  First, if a state court has decided that the CDC's Order is unconstitutional and permits one of the landlords to evict their tenant, it would be a remarkable overstep—and antagonistic to basic principles of federalism—for the Department of Justice to then prosecute the plaintiff for violating the Order.  Second, even if the Department of Justice did choose to prosecute, the evicting landlord would have a strong defense that they were acting in reliance on an official pronouncement of the law by the state court. *See United States v. Laub*, 385 U.S. 475, 487, 87 S. Ct. 574, 581 (1967) ("Ordinarily, citizens may not be punished for actions undertaken in good faith reliance upon authoritative assurance that punishment will not attach."); *United States v. Barker*, 546 F.2d 940, 947 (D.C. Cir. 1976) ("[A]lthough the basic policy behind the

Plaintiffs' access to courts theory suffers from similar defects. Like their first theory, the plaintiffs' access to court injury is not one this Court has traditionally recognized as irreparable. *See City of Jacksonville*, 896 F.2d at 1285–86. And, again, this injury has a remedy, which becomes clear when we look at the requirements for an access to courts claim. To make out a forward-looking denial-of-access claim,[11] a plaintiff must show that they are "presently den[ied] an opportunity to litigate." *Christopher v. Harbury*, 536 U.S. 403, 413, 122 S. Ct. 2179, 2186 (2002); *see also Broudy v. Mather*, 460 F.3d 106, 121 n.9 (D.C. Cir. 2006) (stating that although *Harbury* discussed this requirement in the context of a backward-looking claim, nothing "suggests that a forward-looking claim can proceed if a plaintiff can still meaningfully pursue the underlying claim"). Simply stating that a plaintiff cannot get their preferred remedy at this time is not enough. *See, e.g.*, *City of Jacksonville*, 896 F.2d at 1285 ("The possibility that adequate compensatory or other corrective relief *will be available at a later date*, in the

mistake of law doctrine is that, at their peril, all men should know and obey the law, in certain situations there is an overriding societal interest in having individuals rely on the authoritative pronouncements of officials whose decisions we wish to see respected." (footnote omitted)). And third, it is possible that the Department of Justice would seek to intervene in the state court proceeding to defend the constitutionality of the CDC's Order and thus would be bound by the state court's ultimate ruling.

[11] In a forward-looking access to courts claim, "the essence of the access claim is that official action is presently denying an opportunity to litigate for a class of potential plaintiffs. The opportunity has not been lost for all time, however, but only in the short term; the object of the denial-of-access suit, and the justification for recognizing that claim, is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Christopher v. Harbury*, 536 U.S. 403, 413, 122 S. Ct. 2179, 2186 (2002).

ordinary course of litigation, weighs heavily against a claim of irreparable harm." (emphasis added) (citation omitted)); *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 660 (1st Cir. 1997) (stating, in the context of an access to court claim, that there is no constitutional right to a specific form of relief).  Here, the plaintiffs have never been prohibited from commencing eviction proceedings—and, indeed, other proceedings to recoup rent—in state court.  Instead, the plaintiffs are only subject to some delay (by litigating the validity of the Order) in executing on their preferred remedy—eviction.  In my view, this is not enough to even state an access to court claim, much less show irreparable injury.

Put simply, an injunction here does nothing to change the plaintiffs' position; they still need to go challenge the CDC's Order in state-court eviction proceedings.  Because our case law conceives of irreparable harm as an injury that will be suffered "*unless the injunction issues*," I see no way to transmute the plaintiffs' alleged constitutional injuries into irreparable harms here.  *Jefferson Cnty.*, 720 F.2d at 1519 (emphasis added).

## B.

Plaintiffs have also alleged that because they may not be able to recover economic damages from their "judgment-proof" tenants, they have suffered irreparable harm.  Again, there are a few problems with this argument.

First, this Court has clearly held that "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *City of Jacksonville*, 896 F.2d at 1285. We have stated, however, that "when a later money judgment might undo an alleged injury," there may still be irreparable harm if "damages would be 'difficult or impossible to calculate.'" *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (citation omitted). But there is no such difficulty in calculating the plaintiffs' concededly "economic damages" here. For this species of irreparable harm, the plaintiffs have simply alleged that they have not received rent from their tenants for a certain period of time. It is indisputable that these injuries are (1) monetary and (2) readily quantifiable; they are simply each tenants' rent payment multiplied by the number of unpaid months, plus any late fees or interest. Because this harm could be undone by a monetary judgment, it is not irreparable. *See City of Jacksonville*, 896 F.2d at 1285.

Second, even if we set aside our case law precluding monetary irreparable harms, nothing in the CDC's Order prevents the plaintiffs from pursuing lawsuits to recover unpaid rent or to enforce the contractual terms of their rental agreements. Indeed, the Order expressly provides that landlords may continue to charge or collect "fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis." Order at 55,294. So, although their tenants are currently unable to pay rent, the plaintiffs are not precluded from

31

obtaining a money judgment and seeking execution on that judgment through, for example, writs of execution and garnishment.

On this point, I am unconvinced by the plaintiffs' reliance on *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348 (11th Cir. 2019), for the proposition that the inability to recoup losses is an irreparable harm. As the District Court correctly pointed out, the IRS in *Askins* presented extraordinarily strong evidence that the defendants would be unable to pay a future money judgment in support of its request for injunctive relief. *Id.* at 1351–52. Specifically, the IRS showed that the defendants failed to pay their employment taxes for *seven years*. *Id.* During that time, the IRS expended significant resources on numerous attempts to collect the debt, each of which the defendants avoided. *Id.* at 1352, 1360. As a result, we held that, "in all likelihood, the government will never recoup these losses." *Id.* at 1360.

By contrast, the plaintiffs' theory of insolvency relies almost entirely on the fact that their tenants have submitted CDC declarations stating that they will make less than $99,000 this year and are currently unable to pay full rent. *See* Oral Argument at 6:30–7:30. But plaintiffs have presented no evidence that writs of execution, garnishment, or other methods of executing on a judgment would be unsuccessful; no evidence of their tenants' employment prospects; no evidence of their tenants' assets; no evidence of their efforts to collect unpaid rent; and no

32

evidence that the tenants failed to pay rent prior to the pandemic.[12]  In fact, declarations from the plaintiffs suggest that most of their tenants paid on time before the COVID-19 outbreak.  In my view, the plaintiffs' actual concern is that they will not be able to collect unpaid rent *immediately* following the expiration of the moratorium, not that they will *never* be able to collect it.  Accordingly, I would hold that the plaintiffs' speculative allegations of insolvency are not enough to demonstrate irreparable harm.  *See Ruffin v. Great Dane Trailers*, 969 F.2d 989, 995 (11th Cir. 1992) ("An injunction is inappropriate if the possibility of future harm to the plaintiff arising out of the behavior plaintiff seeks to enjoin is purely speculative.").

---

[12] The dissent frames my concern as one grounded in speculation—that I would have this Court "play hiring manager and guess whether the tenants are likely to receive job offers, promotions, raises, or additional shifts based on their occupation or current employment status." That is not my point at all.  Rather, my core concern is that plaintiffs' evidence starts and ends with their tenants' declarations.  And the dissent reads those declarations as swearing "to facts that amount to insolvency."  I do not believe that's quite right.  It is entirely possible that a tenant simultaneously has a job that would allow for garnished wages in the event that a judgment is entered against her *and* (1) has used best efforts to obtain all available government assistance for rent, (2) expects to earn no more than $99,000 in annual income for 2020, (3) is unable to pay full rent due to substantial loss of household income, (4) is using best efforts to make partial payments, and (5) would need to move into a new residence shared by other people who live in close quarters if evicted.  For example, a tenant that is paying only 80% of her rent because she started a new, lower-paying job during the pandemic may be subject to eviction once the Order has expired, but she is not necessarily "insolvent."  So, since it is the plaintiffs' burden of persuasion on irreparable harm, I believe they need to provide more than just their tenants' declarations to establish that the tenants are judgment proof.

33

C.

Plaintiffs next claim that because they have been "denied access to their unique real property," they have been irreparably harmed. But this argument fails for the same reason as the plaintiffs' "constitutional harms."

At risk of repetition, the CDC's Order does not—and has never—prevented the plaintiffs from initiating eviction proceedings in state court. Had the plaintiffs done so, they could have challenged the constitutionality of the Order and possibly prevailed, allowing them to evict their tenants. But instead, the plaintiffs sought a preliminary injunction in federal court that, in effect, gives them nothing. Even with the injunction, the plaintiffs will still need to return to state court and hash out the constitutionality of the CDC's Order during eviction proceedings. *See* part II, *supra*. If the plaintiffs' alleged harm is the same with or without the injunction, I see no way that it can be "irreparable." *See Jefferson Cnty.*, 720 F.2d at 1519 (stating that a movant must show that "he will suffer irreparable injury *unless the injunction issues*" (emphasis added)).

Regardless, I believe the District Court was right to reject the plaintiffs' categorical contention that temporary deprivation of residential property is a "*per se* irreparable injury." While this Court has said that "irreparable injury is suffered when one is wrongfully ejected from his home," *Johnson v. U.S. Dep't of Agric.*,

34

734 F.2d 774, 789 (11th Cir. 1984), we did so in the context of *residents* of those homes being ejected, not landlords being prevented from repossessing a rental property. Indeed, we stated that the harm in *Johnson* was irreparable because the ejected residents "must live in inadequate, often health endangering housing for any period of time as a consequence of a wrongful ejectment." *Id.* Plaintiffs cannot shoehorn their alleged harms into that mold by summarily claiming that they may someday wish to move into the homes they are currently renting to tenants. As a result, I would conclude that the plaintiffs' alleged deprivation of access to their rental properties is not an irreparable harm.

IV.

In sum, an injunction should issue only if a district court judge finds "that certain, immediate, and irreparable injury to a substantial interest of the movant will occur if the application [for the injunction] is denied and the final decree is in his favor." *Calagaz v. DeFries*, 303 F.2d 588, 589 (5th Cir. 1962).[13] No such harm exists here. With or without the CDC's eviction moratorium, and with or without this Court's decision today, the plaintiffs in this case have been free to pursue judicial remedies for their injuries: breach of contract actions for unpaid

---

[13] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

35

rent and eviction actions to remove nonpaying tenants.  The availability of those judicial remedies, in my view, precludes a finding of irreparable harm and compels us to affirm the District Court.

BRANCH, Circuit Judge, dissenting:

In 1944, Congress enacted the Public Health Service Act, Pub. L. No. 78-410, 58 Stat. 682 (codified as amended at 42 U.S.C. § 201 *et seq*.). The Act provides, in relevant part, that "[t]he Surgeon General, with the approval of the Secretary, is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases . . . from one State or possession into any other State or possession."[1] 42 U.S.C. § 264(a). Three-quarters of a century later, the U.S. Centers for Disease Control and Prevention ("CDC") invoked this provision to enact, for the first time, a nationwide residential eviction moratorium. *See* Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020) [hereinafter CDC Order].

Several landlords and an association of rental housing providers sued the government to challenge the CDC Order and sought a preliminary injunction, which the district court denied.[2] On appeal, they argue that the CDC Order exceeds the CDC's statutory authority under § 264(a) and that money damages

---

[1] This rulemaking authority has been delegated to the Director of the U.S. Centers for Disease Control and Prevention. *See* Reorganization Plan No. 3 of 1966, 31 Fed. Reg. 8855 (June 25, 1966); 42 C.F.R. § 70.2.

[2] The landlords sued the U.S. Department of Health and Human Services ("HHS"), the CDC, the Secretary of HHS, and the Acting Chief of Staff of the CDC. For convenience, I refer to these entities collectively as the "government."

against their insolvent tenants would be an inadequate remedy for their financial

harms.  Because the landlords have shown that the CDC's interpretation of

§ 264(a) stretches the meaning of the statute "beyond what the statutory text can

naturally bear," *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33,

51 (2008), and that money damages against their insolvent tenants would be an

inadequate remedy for their financial harms, the district court abused its discretion

in denying their motion for a preliminary injunction.  Accordingly, I respectfully

dissent.

## I.    Background

### A.    Facts

#### 1.    The CDC Order

On September 4, 2020, the CDC invoked its authority under "Section 361 of

the Public Health Service Act (42 U.S.C. 264) and 42 C.F.R. 70.2" to issue a

nationwide residential eviction moratorium.  *See* CDC Order, 85 Fed. Reg. at

55,292, 55,297.  In the order, the CDC explained that:

> [E]victions threaten to increase the spread of COVID-19 as they force
> people to move, often into close quarters in new shared housing
> settings with friends or family, or congregate settings such as
> homeless shelters.  The ability of these settings to adhere to best
> practices, such as social distancing or other infection control
> measures, decreases as populations increase.  Unsheltered
> homelessness also increases the risk that individuals will experience
> severe illness from COVID-19.

38

*Id*. at 55,296.  While the CDC Order is in place, "landlords are prohibited from evicting a covered person from a residential property for the non-payment of rent."[3]

To qualify as a "covered person," a tenant must provide their landlord with a declaration stating, under penalty of perjury, that they:

> (1) have "used best efforts to obtain all available government assistance for rent or housing";[4]
> (2) "expect to earn no more than $99,000 in annual income";
> (3) are "unable to pay [their] full rent or make a full housing payment due to substantial loss of household income";
> (4) are "using best efforts to make timely partial payments that are as close to the full payment as [their] circumstances may permit, taking into account other nondiscretionary expenses"; and
> (5) "would likely [be] rendere[d] . . . homeless [by eviction]—or force[d] . . . to move into and live in close quarters in a new congregate or shared living setting—because [they] ha[ve] no other available housing options."[5]

*Id*. at 55,293.  The CDC Order is not limited in its application to tenants infected with or exposed to COVID-19.  *Id*.

---

[3] The CDC Order defines "eviction" as "any action by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or a possessory action, to remove or cause the removal of a covered person from a residential property.  This does not include foreclosure on a home mortgage."  85 Fed. Reg. at 55,293.

[4] "'Available government assistance' means any governmental rental or housing payment benefits available to the individual or any household member."  CDC Order, 85 Fed. Reg. at 55,293.

[5] The CDC Order defines "available housing" as "any available, unoccupied residential property, or other space for occupancy in any seasonal or temporary housing, that would not violate Federal, State, or local occupancy standards and that would not result in an overall increase of housing cost to such individual."  85 Fed. Reg. at 55,293.

The CDC Order states that it "does not relieve any individual of any obligation to pay any rent, make a housing payment, or comply with any other obligation that the individual may have under a tenancy, lease, or similar contract." *Id*. at 55,294.  Nor does it "preclude[] the charging or collecting of fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract." *Id*.  Finally, it permits a landlord to evict a tenant, based on the tenant's:

> (1) [e]ngaging in criminal activity while on the premises;
> (2) threatening the health or safety of other residents;
> (3) damaging or posing an immediate and significant risk of damage to property;
> (4) violating any applicable building code, health ordinance, or similar regulation relating to health or safety; or
> (5) violating any other contractual obligation, other than the timely payment of rent or similar housing-related payment (including non-payment or late payment of fees, penalties, or interest).

*Id*. (footnote omitted).

The CDC Order was initially set to expire on December 31, 2020.  *Id*. at 55,297.  On December 27, 2020, Congress passed the Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, 134 Stat. 1182, 2078–79 (2020), which states: "The order issued by the Centers for Disease Control and Prevention under section 361 of the Public Health Services Act (42 U.S.C. 264), entitled 'Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19 . . . is extended through January 31, 2021, notwithstanding the effective dates specified in such

Order." Congress also appropriated $25 billion in emergency rental assistance for certain tenants. *See id*. at 2069–78. On January 29, 2021, the CDC extended the order through March 31, 2021. *See* Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 8020–21, 8025 (Feb. 3, 2021). And on March 29, 2021, the CDC extended the order through June 30, 2021. *See* Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 16,731, 16,738 (Mar. 31, 2021).

On March 11, 2021, Congress passed the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4, 54–58, which appropriated another $21.5 billion in emergency rental assistance. Finally, on June 24, 2021, the CDC extended the order through July 31, 2021. *See* Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 34,010, 34,016 (June 28, 2021). Although the CDC states that it "does not plan to extend the Order further," it has reserved the power to do so in case of "an unexpected change in the trajectory of the pandemic." *Id*. at 34,013.

### 2. The Landlords

#### i. Richard Lee Brown

Richard Lee Brown owns a residential property in Winchester, Virginia. In his declaration, he alleges that his tenant has fallen behind on rent and owes $8,092

41

in unpaid rent.  He states that, based on information provided to him by his tenant,[6] he believes that she is a "covered person" as defined by the CDC Order, but that he still intends to seek an eviction against her.  He alleges that his "tenant is also insolvent, and [he] will not be able to obtain any economic relief or damages from her."

ii.    Jeffrey Rondeau

Jeffrey Rondeau owns a residential property in Vale, North Carolina, that he purchased "to be [his] home when [he] retire[s]."  In his declaration, he alleges that his tenant owes $2,100 in unpaid rent and associated legal fees and has not paid any rent since July 6, 2020.  He alleges that, after he obtained a writ of summary ejectment from a North Carolina state court, his tenant provided him with an affidavit consistent with the CDC Order, but that he still intends to evict the tenant.  Rondeau declared that his tenant is insolvent and that if he is "unable to earn any rental income for the property prior to January 2021, [he] will likely be unable to pay [his] existing mortgage and will be at risk of foreclosure."  During the pendency of this appeal, however, his tenant vacated the property.

---

[6] "At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quotation omitted).  The district court accepted the averments in the landlords' declarations and its decision to do so was not clearly erroneous.

iii.    David Krausz

David Krausz owns a residential property in Columbia, South Carolina.  In his declaration, he alleges that his tenant fell behind on rent in July 2020 and owes approximately $2,265 in unpaid rent.[7]  Shortly after he filed for an eviction in July 2020, he entered into a consent agreement with the tenant, which provided that the tenant would have four days to pay $700 towards past-due rent, and then was required to pay an additional $2,265 in unpaid rent by August 31, 2020.  Although the tenant paid the $700, she failed to pay any portion of the outstanding $2,265.

Krausz then scheduled an eviction of his tenant.  Before the eviction could be carried out, his "tenant provided the South Carolina court with a declaration consistent with the CDC's September 4, 2020 eviction order" and "[t]he South Carolina court . . . immediately stayed the eviction."[8]  Krausz alleges that his "tenant appears to be insolvent, and [he] will not likely be able to obtain any economic relief or damages from her."

iv.    Sonya Jones

---

[7] Krausz filed his declaration on September 17, 2020.  Under the lease agreement with his tenant, his tenant owes $700 each month in rent.

[8] Although the South Carolina court stayed the eviction in purported compliance with the CDC Order, nothing in the Order itself dictates that course of action.  Instead, the CDC Order regulates the behavior of "a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action."  85 Fed. Reg. at 55,296; *see id.* (noting that "cooperating State and local authorities" may enforce the CDC Order, but not requiring them to do so).  The concurrence takes the position that the CDC Order is "an affirmative defense to eviction" in state court.  But nothing in the CDC Order purports to create an affirmative defense to eviction or legal rights for a tenant.  *See* 85 Fed. Reg. at 55,296.

43

Sonya Jones owns a residential property in Jesup, Georgia. In her declaration, she alleges that her tenant fell behind on rent and owes more than $1,800 in unpaid rent. After Jones initiated eviction proceedings in a Georgia court, "the tenant said that his challenge to the eviction was related to the COVID-19 pandemic, and the court continued all proceedings until January 2021 in purported compliance with [the] CDC's eviction moratorium order." Jones states that, based on the information provided to her by her tenant and her tenant's representations in court, she believes he is a "covered person" as defined by the CDC Order. Like the other landlords, she alleges that her "tenant is also insolvent, and [she] will not be able to obtain any economic relief or damages from him."

v.      The National Apartment Association

The National Apartment Association is "the largest national trade association dedicated to the interests of rental housing providers in the United States." It "represents the owner[s] and managers of over 10 million apartment homes and has 85,185 members that [allegedly] have been irreparably harmed by the CDC Order and its unwarranted insertion of authority into landlord/tenant regulation in an area historically addressed by the courts and state legislatures." In particular, the Association alleges that "the CDC order has limited housing owners and managers from providing contracted services to tenants who have paid their rent and paying financial obligations like taxes and mortgages."

44

B.    Procedural History

The landlords filed a complaint against the government in the U.S. District Court for the Northern District of Georgia and sought a preliminary injunction that would block the government from enforcing the CDC Order.  In their motion for a preliminary injunction, the landlords argued that the CDC Order exceeds the statutory authorization of § 264(a), and that, without an injunction, they will "suffer irreparable [financial] harm . . . through lost business opportunities that [cannot] be recovered from the tenant[s]" because "tenants covered by the CDC Order, by definition, are insolvent."[9]  *See* 5 U.S.C. § 706(2)(C) (providing that we must "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

In its response, the government argued that the CDC acted within its statutory authority when it issued the order and that the landlords had failed to demonstrate that they would suffer an irreparable injury absent an injunction.  The government argued that the landlords' allegations about their tenants' insolvency "lack[ed] support" and did not meet their burden of "a well-supported showing that

---

[9] The landlords asserted two additional theories on the merits—that the CDC Order is arbitrary and capricious and that it violates their right of access to the courts—and two additional theories of irreparable injury—the violation of their constitutional rights and the loss of unique real property.  Because the landlords demonstrated a substantial likelihood of success on their argument that the CDC Order exceeds the statutory authorization of § 264(a), *see* Part III.B, *infra*, and that Krausz's financial harms qualify as an irreparable injury, *see* Part III.C, *infra*, I do not address their alternative theories on the merits or of irreparable injury.

a future monetary judgment will be inadequate." The landlords replied that "the CDC Order *requires* the tenant to be insolvent and 'unable to pay the full rent . . . due to a substantial loss of household income' and using 'best efforts to make timely partial payments.'"

The district court held an evidentiary hearing on the motion on October 20, 2020. At the hearing, the landlords argued that "the fact that these tenants are all covered persons under the CDC order makes them per se judgment proof." The government responded that the landlords failed to "ma[ke] the requisite evidentiary showing that any of these . . . tenants are insolvent." In particular, the government argued that "the [CDC] order [does] not require that the tenants be insolvent, the order requires that the tenants make below a certain income threshold and are unable to pay full rent and are using best efforts to make timely partial payments."

The district court challenged the landlords' argument about their tenants' insolvency. It stated: "I'm looking at the [tenants'] declaration[s], where does it say [the tenants] are insolvent? I see that it says they're unable to make full rent, but where in the declaration does it say 'I am insolvent'"? The landlords conceded that "the declaration itself doesn't say they're insolvent," but argued that the fact that their tenants met the terms of the CDC Order, especially "condition[s] three and four"—that "they are unable to pay the full rent or make a full housing payment due to a substantial loss of household income" and that "they are using

46

best efforts to make timely partial payments as close to full payment as the individual's circumstances permit"—coupled with "the fact that these individual tenants are all paying nothing, that equates to a declaration that these tenants are unable to pay anything towards their rent, that is a declaration under oath that the best efforts that they can make because of their financial circumstances is zero payment."[10]  After the hearing, the district court issued an order denying the landlords' motion for a preliminary injunction.  It found that the landlords failed to "establish[] their burden of persuasion as to any of the . . . prerequisites" for a preliminary injunction.

In its order, the district court rejected the landlords' argument "that the CDC acted without statutory and regulatory authority."  It found that "the plain language" of § 264(a) makes clear that "Congress gave the Secretary of HHS broad power to issue regulations necessary to prevent the introduction, transmission, or spread of communicable diseases."  Based on "the clear and broad delegation of authority in the first sentence of § 264(a); the context provided by the subsequent subsections; . . . and persuasive authority from" *Independent Turtle Farmers of*

---

[10] The district court also inquired whether the landlords had made use of funds pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, 134 Stat. 281 (2020).  The landlords responded "with confidence . . . that the forenamed plaintiffs . . . have [not] received any sort of governmental assistance . . . that offsets what's happening to them."  The district court then asked the government whether "these landlords . . . [were] eligible for any CARES Act funds."  The government responded that it did not know.

*Louisiana v. United States*, 703 F. Supp. 2d 604 (W.D. La. 2010), it found that the landlords failed to establish a likelihood of success on the merits that the CDC acted without statutory and regulatory authority.

The district court also found that the landlords "ha[d] not met their burden to clearly show an irreparable injury." In the district court's view, the landlords failed to demonstrate "that their tenants are insolvent, and thus any judgment obtained against them would be uncollectible." It cited our decision in *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348 (11th Cir. 2019), to fault the landlords for failing to "presen[t] any evidence regarding collection measures that they have taken to ensure that the rent is paid or whether a legal tool, such as a levy or garnishment, would be unsuccessful in the event a judgment is entered at a later time." It also faulted the landlords for failing to introduce evidence regarding:

> the occupation of any of the tenants, whether they are employed or unemployed (and, if unemployed, their prospect for reemployment), whether they are (or have been) sick, whether they have money in the bank, whether they qualify for some type of government assistance, whether they could obtain a loan to cover their rent or the nature of their credit histories.[11]

---

[11] The district court also rejected the landlords' alternative theory of irreparable injury predicated on the loss of unique real property. It found that "[t]here is no evidence before the Court that any of the individual plaintiffs reside in the properties or are in danger of losing those properties," and that the landlords had failed to demonstrate any unique factors related to their properties because the properties were merely "rental property." This finding was clearly erroneous.

Finally, the district court found that "the public's interest in controlling the spread of COVID-19 i[s] not outweighed by [the landlords'] interests in preventing the . . . economic harm alleged here." It found that the government "has shown that COVID-19 is an easily transmissible, potentially serious and sometimes fatal disease," and that "the consequences of eviction (overcrowding, homelessness and housing instability) undermine crucial strategies for containing COVID-19." It then found that "[a]lthough [the landlords] have shown an economic harm, that economic harm pales in comparison to the significant loss of lives that [the government] ha[s] demonstrated could occur should the Court block the Order." The landlords timely appealed.[12]

## II.    Standard of Review

We review the denial of a preliminary injunction for abuse of discretion, reviewing the district court's findings of fact for clear error and its legal conclusions *de novo*. *Scott v. Roberts*, 612 F.3d 1279, 1289 (11th Cir. 2010). "A district court abuses its discretion if it applies an incorrect legal standard, applies

---

In his declaration, Rondeau stated that the property his tenant was occupying was one that he "purchased . . . to be [his] home when [he] retire[s]"—a unique factor—and that if he was "unable to earn any rental income for the property prior to January 2021, [he would] likely be unable to pay [his] existing mortgage and [would] be at risk of foreclosure"—which constitutes danger of losing the property. Thus, it was clearly erroneous for the district court to find that Rondeau failed to establish irreparable injury. Nevertheless, Rondeau's tenant vacated the property during the pendency of this appeal, so I do not address Rondeau's injuries.

[12] After the appeal was docketed, the landlords filed a motion for an injunction pending appeal. We denied their motion.

the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1068 (11th Cir. 2014) (citation omitted).

## III.    Discussion

To obtain a preliminary injunction, the landlords must demonstrate: (1) "a substantial likelihood of success on the merits"; (2) that they will suffer an irreparable injury unless the injunction is granted; (3) that the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) that the injunction "would not be adverse to the public interest." *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020).  The third and fourth factors "'merge' when, as here, the [g]overnment is the opposing party."  *Id*. at 1293 (quotation omitted); *cf. Nken v. Holder*, 556 U.S. 418, 435 (2009).

### A.    Standing

Before turning to the merits, we must address whether the landlords have standing to sue.  *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc) ("Because standing to sue implicates jurisdiction, a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim."); *see Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316,

324 (2008) ("[W]e bear an independent obligation to assure ourselves that jurisdiction is proper before proceeding to the merits.").

"The irreducible constitutional minimum of Article III standing entails three elements: injury in fact, causation, and redressability." *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 994 F.3d 1341, 1345 (11th Cir. 2021) (quotation omitted). Because the landlords seek only injunctive relief, only one plaintiff with standing is required. *See Crawford v. Marion Cnty. Elec. Bd.*, 553 U.S. 181, 189 n.7 (2008); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977). I conclude that Krausz has standing and thus do not address the other landlords' standing.[13]

### 1.    Injury in Fact

Krausz has adequately alleged an injury in fact. An injury in fact "must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation omitted). "An allegation of future injury may suffice if . . . there is a

---

[13] Because I do not address the other landlords' standing, I do not consider their individual claims in determining whether the landlords have demonstrated the prerequisites for a preliminary injunction. In determining whether the landlords have demonstrated a substantial likelihood of success on the merits, irreparable injury, and that the balance of the harms and public interest favor an injunction, I will focus exclusively on Krausz's claims. *See* Part III.B, C, and D, *infra*.

substantial risk that the harm will occur." *Id.* (quotation omitted); *see Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 927 (2020) (en banc).

In his declaration, Krausz alleges that he was granted a writ of ejectment to evict his tenant. But before the eviction could take place, he alleges, his "tenant provided the South Carolina court with a declaration consistent with the CDC's September 4, 2020 eviction order" and "[t]he South Carolina court then immediately stayed the eviction." As a result of the stayed eviction, he alleges that he has "incurred significant economic damages, including approximately $2,265 in unpaid rent and fees." These allegations are sufficient to establish an injury in fact. *See Susan B. Anthony List*, 573 U.S. at 158; *see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

In addition to the economic damages he has already suffered, Krausz has sufficiently alleged a future injury—"the lost opportunity to rent or use the property at fair market value of at least $700 per month." Under the terms of his lease agreement, his tenant is required to pay $700 each month in rent. But the tenant has filed a declaration stating, under penalty of perjury, that she is "unable to pay rent because of economic stress arising from the COVID-19 pandemic." Because there is a substantial risk that Krausz will not receive the rent payments

52

contemplated under the lease agreement, he has adequately demonstrated a future injury. *See Muransky*, 979 F.3d at 927.

2.     Traceability and Redressability

Krausz has also adequately demonstrated that his injuries are traceable to the government's conduct and redressable by a favorable judicial decision. The doctrines of traceability and redressability are closely linked, so I will consider them together. *See* 13A Charles A. Wright et al., Federal Practice and Procedure § 3531.6 (3d ed. June 2021 update) ("The remedial-benefit dimension of standing analysis blends into causation.").

Traceability is the requirement that a plaintiff's injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (alterations adopted). "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (alterations in original) (quotation omitted); *see Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 148 F.3d 1231, 1247 (11th Cir. 1998) ("[S]tanding is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties.").

53

Krausz's injuries are fairly traceable to the CDC Order. The Order states: "[A] landlord . . . shall not evict any covered person from any residential property in any State or U.S. territory in which there are documented cases of COVID-19 that provides a level of public-health protections below the requirements listed in this Order." 85 Fed. Reg. at 55,296. Krausz was granted a writ of ejectment by a South Carolina court and had scheduled an eviction, but the state court stayed the eviction after his "tenant provided [it] with a declaration consistent with the CDC's September 4, 2020 eviction order." Thus, the eviction was stayed because of the CDC Order and Krausz's injuries are fairly traceable to it.

Redressability is the requirement that "a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1304 (11th Cir. 2011) (quotation omitted). "Financial loss . . . is a paradigmatic example of an injury in fact that is redressable by a favorable judicial decision." *Pincus v. Am. Traffic Sols., Inc.*, 986 F.3d 1305, 1310 n.7 (11th Cir. 2021).

In assessing redressability, "we ask whether a decision in a plaintiff's favor would significantly increase . . . the likelihood that she would obtain relief that directly redresses the injury that she claims to have suffered." *Lewis*, 944 F.3d at 1301 (alterations adopted) (quotations omitted). We have also held that "it must be

54

the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Id*. (quotation omitted) (emphasis omitted).

The concurrence argues that Krausz's injuries are not redressable because neither his tenant nor the state court is a party in this case and neither will be bound by an injunction issued by the district court.[14] In its view, although "the state court could take judicial notice of this Court's decision and the subsequent injunction, they do not bind that court to any particular result." *See Glassroth v. Moore*, 335 F.3d 1282, 1302 n.6 (11th Cir. 2003) ("[S]tate courts when acting judicially . . . are not bound to agree with or apply the decisions of federal district courts and courts of appeal."). But that concern does not defeat redressability here. *See Lujan*, 504 U.S. at 562 (noting that a plaintiff may still establish standing where "one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict" (internal citation omitted)). An "injury produced by [a defendant's] determinative or coercive effect upon the action of [a third party]" may still be redressable.

---

[14] The concurrence disclaims any reliance on the doctrine of redressability and insists that its concern is "irreparable harm, not standing," because the issuance of a preliminary injunction here would "do[] nothing" for the landlords. But if a preliminary injunction would not redress the landlords' injuries, the landlords would lack standing to seek a preliminary injunction.

55

*Bennett v. Spear*, 520 U.S. 154, 169 (1997) (alterations adopted) (internal citations omitted).

Although the South Carolina court is not strictly bound to apply our decision or the district court's decisions, *see Glassroth*, 335 F.3d at 1302 n.6, its own decision to stay the eviction of Krausz's tenant was not unfettered and free from coercion. As a state court, the South Carolina court is bound to follow federal law. *See* U.S. Const. art. VI ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). And the South Carolina court stayed the eviction in purported compliance with the CDC Order.

Further, it is substantially likely that the South Carolina court would abide by our interpretation of the federal statute that the CDC invoked to issue the Order. *See Made in the USA Found. v. United States*, 242 F.3d 1300, 1309–10 (11th Cir. 2001) ("[W]e may assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination." (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992))); *cf. Dep't of Comm. v. New York*, 139

S. Ct. 2551, 2566 (2019) ("Respondents' theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties."). Krausz was granted a writ of ejectment and was entitled to evict his tenant under South Carolina law. The South Carolina court stayed the eviction only after it was presented with the CDC Order and a declaration from Krausz's tenant consistent with that order. Thus, Krausz has demonstrated a substantial likelihood of redressability. *See Wilding*, 941 F.3d at 1126–27 ("To have Article III standing, a plaintiff need not demonstrate anything more than . . . a substantial likelihood of redressability." (quotation omitted)).

*    *    *

Because Krausz has adequately alleged an injury in fact, traceability, and redressability, he has standing to seek an injunction. I now turn to the merits of this appeal and the four factors the landlords must establish to obtain a preliminary injunction.

B.    Likelihood of Success on the Merits[15]

---

[15] While the majority "ha[s] doubts about the district court's ruling . . . [that] the plaintiffs [did not establish that they] are likely to succeed on the merits," it reaches no conclusion about whether the landlords have established a likelihood of success on the merits. Therefore, I must conduct an independent analysis of whether the landlords have established a likelihood of success on the merits.

The district court abused its discretion in finding that the landlords failed to establish a substantial likelihood of success on the merits of their claim that the CDC Order exceeds statutory authority.  Under the Administrative Procedure Act, we must "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory . . . authority."  5 U.S.C. § 706(2)(C).

The CDC Order invokes 42 U.S.C. § 264(a) as authority.[16]  *See* 85 Fed. Reg. at 55,297.  Thus, I begin my analysis with the text of § 264(a).  *See Whaley v. Guillen (In re Guillen)*, 972 F.3d 1221, 1226 (11th Cir. 2020).

Section 264(a) provides:

> The Surgeon General, with the approval of the Secretary, is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession.  For purposes of carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous

---

[16] The CDC Order also invokes 42 C.F.R. § 70.2 as authority.  85 Fed. Reg. at 55,297.  But an administrative rule cannot exceed the scope of the statute upon which it is predicated.  *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976); *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1299 (11th Cir. 2019) ("[R]egulations cannot contradict their animating statutes or manufacture additional agency power."); *see also* 5 U.S.C. § 706(2)(C).  Because 42 C.F.R. § 70.2 was promulgated under the authority of § 264(a), *see* Control of Communicable Diseases; Apprehension and Detention of Persons with Specific Diseases; Transfer of Regulations, 65 Fed. Reg. 49,906, 49,908 (Aug. 16, 2000), it cannot independently authorize the CDC Order if the Order exceeds the powers conferred in § 264(a).  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) ("[A]n administrative agency's power to regulate . . . must always be grounded in a valid grant of authority from Congress.").

infection to human beings, and other measures, as in his judgment
may be necessary.

42 U.S.C. § 264(a). The landlords argue that § 264(a) does not grant the Director

of the CDC the authority to implement a nationwide residential eviction

moratorium because the authority set out in § 264(a) is limited to "actions taken

with respect to *infected* articles and people." The government counters that,

although § 264(a) "do[es] not confer unbounded authority . . . [it] provide[s]

substantial flexibility for the CDC to act to prevent the interstate spread of

disease"—including through implementing a nationwide residential eviction

moratorium.

There are two provisions in § 264(a) that could be interpreted to provide

authority for the CDC Order: (1) the first sentence—which grants the Director of

the CDC the authority to "make and enforce such regulations as in his judgment

are necessary to prevent the introduction, transmission, or spread of communicable

diseases," and (2) the second sentence—which grants the Director of the CDC the

authority to "provide for such inspection, fumigation, disinfection, sanitation, pest

extermination, destruction of animals or articles found to be so infected or

contaminated as to be sources of dangerous infection to human beings, and other

measures, as in his judgment may be necessary." 42 U.S.C. § 264(a). But neither

of these provisions reasonably can be interpreted to authorize the CDC Order.

       1.     The First Sentence of § 264(a)

59

Although the first sentence of § 264(a) could be read literally to authorize the CDC Order—because it empowers the Director of the CDC to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases"—such a reading is not a reasonable construction of the statute because it ignores the effect of the rest of § 264.[17]

Instead, the first sentence of § 264(a) should be read in light of the other provisions of § 264—that is, as granting the Director of the CDC general rulemaking power, subject to the specific limitations set out immediately following the grant. *See Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, No. 20-cv-3377, 2021 WL 1779282, at *5 (D.D.C. May 5, 2021) ("[The] broad grant of rulemaking authority in the first sentence of § 264(a) is tethered to—and narrowed by—the second sentence."); *see also Florida v. Becerra*, No. 21-cv-839, 2021 WL 2514138, at *19 (M.D. Fla. June 18, 2021).[18]

---

[17] *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1828 (2020) (Kavanaugh, J., dissenting) ("Statutory Interpretation 101 instructs courts to follow ordinary meaning, not literal meaning, and to adhere to the ordinary meaning of phrases, not just the meaning of the words in a phrase."); *see also* Antonin Scalia, *A Matter of Interpretation* 23 (1997) ("A text should not be construed strictly, and it should not be construed leniently; it should be construed reasonably, to contain all that it fairly means."); Amy Coney Barrett, *Assorted Canards of Contemporary Legal Analysis: Redux*, 70 Case W. Res. L. Rev. 855, 859 (2020) ("[T]extualism isn't a mechanical exercise, but rather one involving a sophisticated understanding of language as it's actually used in context.").

[18] Agencies, like the CDC, "are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those

60

For example, the second sentence of § 264(a) provides that "[f]or purposes

of carrying out and enforcing such regulations, the Surgeon General may provide

for such inspection, fumigation, disinfection, sanitation, pest extermination,

destruction of animals or articles found to be so infected or contaminated as to be

sources of dangerous infection to human beings, and other measures, as in his

judgment may be necessary."  Further, § 264(d) provides that "[r]egulations

prescribed under this section may provide for the apprehension and examination of

any individual reasonably believed to be infected with a communicable disease." [19]

Reading the first sentence of § 264(a) broadly to authorize the Director of the CDC

to make and enforce *any* measure would make the second sentence of § 264(a) and

the entirety of § 264(d) unnecessary.[20]  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31

---

purposes."  *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994); *see Ernst & Ernst*, 425 U.S. at 213–14; *see also D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932) ("General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment. Specific terms prevail over the general in the same or another statute which otherwise might be controlling." (citation omitted)); *In re Read*, 692 F.3d 1185, 1191 (11th Cir. 2012).

[19] Section 264(d) provides, in relevant part, that:

Regulations prescribed under this section may provide for the apprehension and examination of any individual reasonably believed to be infected with a communicable disease in a qualifying stage and (A) to be moving or about to move from a State to another State; or (B) to be a probable source of infection to individuals who, while infected with such disease in a qualifying stage, will be moving from a State to another State.  Such regulations may provide that if upon examination any such individual is found to be infected, he may be detained for such time and in such manner as may be reasonably necessary.

[20] The government takes the opposite position.  It argues that § 264(b), (c), and (d) indicate that the authority granted in the first sentence of § 264(a) is not limited by the second

61

(2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001))); *see Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("[C]ourts should disfavor interpretations of statutes that render language superfluous."); *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute." (quotation omitted)).

Under a literal reading of the first sentence of § 264(a), the Director of the CDC could make regulations that "provide for [the] inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human

---

sentence of § 264(a), because those subsections discuss measures that are not authorized by the second sentence of § 264(a). *See* 42 U.S.C. § 264(b) ("Regulations prescribed under this section shall not provide for the apprehension, detention, or conditional release of individuals except for the purpose of preventing the introduction, transmission, or spread of . . . communicable diseases."); *id*. § 264(c) ("Except as provided in subsection (d), regulations prescribed under this section, insofar as they provide for the apprehension, detention, examination, or conditional release of individuals, shall be applicable only to individuals coming into a State or possession from a foreign country or a possession."); *id*. § 264(d) ("Regulations prescribed under this section may provide for the apprehension and examination of any individual reasonably believed to be infected with a communicable disease.").

I disagree. Measures related to the "apprehension and examination of . . . individual[s] reasonably believed to be infected with a communicable disease," *id*. § 264(b)–(d), are authorized by the second sentence of § 264(a) because they are measures related to articles, animals, or people infected or reasonably believed to be infected with a communicable disease. *See* Part III.B.2, *infra*. Thus, § 264(b), (c), and (d) do not show that the authority granted in the first sentence of § 264(a) is not limited by the enumerations in the second sentence of § 264(a).

62

beings," *see* 42 U.S.C. § 264(a), or "provide for the apprehension and examination of any individual reasonably believed to be infected with a communicable disease in a qualifying stage," *see id.* § 264(d). But this reading would render the second sentence of § 264(a) and the entirety of § 264(d) superfluous. *See Yates v. United States*, 574 U.S. 528, 543 (2015) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."); *see Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) (same).[21]

Given the specific provisions in the second sentence of § 264(a), which set out specific measures that the Director of the CDC can take to prevent the spread of communicable diseases, we should decline to read the first sentence of § 264(a) as authorizing *any* measure that "in his judgment [is] necessary." Instead, we should read the first sentence of § 264(a) as providing the Director of the CDC with general rulemaking authority, subject to the specific limitations set out in the second sentence of § 264(a).

2.      The Second Sentence of § 264(a)

The second sentence of § 264(a)—which empowers the Director of the CDC to "provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or

---

[21] *But see Marx*, 568 U.S. at 385 ("The canon against surplusage is not an absolute rule . . . [it] assists only where a competing interpretation gives effect to every clause and word of a statute." (quotation omitted)).

63

contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary"—does not provide authority for the CDC Order either.  As an initial matter, the CDC Order does not provide for the "inspection, fumigation, disinfection, sanitation, pest extermination, [or] destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings."  Thus, it can be authorized, if at all, as an "other measure[]."

But a nationwide residential eviction moratorium is not a permissible "other measure[]" authorized under the statute.  *See Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 992 F.3d 518, 522–23 (6th Cir. 2021); *Ala. Ass'n of Realtors*, 2021 WL 1779282, at *5; *cf. Becerra*, 2021 WL 2514138, at *20.  Here, "other measures" comes at the end of a list of measures related to articles, animals, or people infected or reasonably believed to be infected with a communicable disease—"inspection, fumigation, disinfection, sanitation, pest extermination, [or] destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings."  42 U.S.C. § 264(a).  "This kind of catchall provision at the end of a list of specific items warrants application of the *ejusdem generis* canon, which says that 'where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific

64

words.'" *Tiger Lily*, 992 F.3d at 522 (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001)); *Ala. Ass'n of Realtors*, 2021 WL 1779282, at *5–6; *see Yates*, 574 U.S. at 550 (Alito, J., concurring) ("*[E]jusdem generis* teaches that general words following a list of specific words should usually be read in light of those specific words to mean something 'similar.'"). It also warrants the application of the *noscitur a sociis* canon, which "instructs that when a statute contains a list, each word in that list presumptively has a 'similar' meaning." *Yates*, 574 U.S. at 549 (Alito, J., concurring).

Applying the canons of *noscitur a sociis* and *ejusdem generis*, "other measures" must be measures like inspection, fumigation, disinfection, sanitation, pest extermination, or destruction of animals or articles found to be sources of dangerous infection—that is, measures related to articles, animals, or people infected or reasonably believed to be infected with a communicable disease. *Cf. Tiger Lily*, 992 F.3d at 522–23; *Ala. Ass'n of Realtors*, 2021 WL 1779282, at *5–6. And a nationwide residential eviction moratorium, without regard to whether the affected tenants are infected with COVID-19 or reasonably believed to be infected with COVID-19, is not such an "other measure" authorized by the statute.[22]

---

[22] The district court cited *Independent Turtle Farmers* in support of its conclusion that the CDC Order is an "other measure" authorized by the statute. In *Independent Turtle Farmers*, the U.S. District Court for the Western District of Louisiana concluded that the second sentence of § 264(a) "does not act as a limitation upon the types of regulations that may be enacted under [the first sentence of § 264(a)]." 703 F. Supp. 2d at 620. As discussed above, this interpretation

65

\*      \*      \*

This interpretation of § 264(a) comports with other principles of statutory interpretation. The Supreme Court has held that "the background principles of our federal system . . . belie the notion that Congress would use . . . an obscure grant of authority to regulate areas traditionally supervised by the States' police power." *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006); *see Tiger Lily, LLC*, 992 F.3d at 523 ("Regulation of the landlord-tenant relationship is historically the province of the states.").[23] It is an "ordinary rule of statutory construction that if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute."[24] *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (quotations omitted); *see Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) ("This

---

of the second sentence of § 264(a) violates the rule against surplusage. Thus, *Independent Turtle Farmers* does not disturb my conclusion that the CDC Order exceeds the CDC's statutory authority. *See also Penn. Nat. Mut. Cas. Ins. Co. v. St. Catherine of Siena Par.*, 790 F.3d 1173, 1179 n.8 (11th Cir. 2015) (noting that we "are not bound by district courts' decisions").

[23] The Supreme Court "has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982); *cf. S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in the denial of an application for injunctive relief) ("Our Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States." (alteration adopted) (quotation omitted)).

[24] Supreme Court precedent also "require[s] Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849–50 (2020).

66

plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere."); *United States v. Bass*, 404 U.S. 336, 349 (1971) ("In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of [a] clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.").[25]  Accordingly, "we cannot read the Public Health Service Act to grant the CDC the power to insert itself into the landlord-tenant relationship without some clear, unequivocal textual evidence of Congress's intent to do so." *Tiger Lily*, 992 F.3d at 523.  And because "[t]here is no 'unmistakably clear' language in the Public Health Service Act indicating Congress's intent to invade the traditionally State-operated arena of landlord-tenant relations," *id*., this clear statement rule supports the conclusion that § 264(a) does not authorize the CDC Order.

Similarly, the major questions doctrine instructs that we should "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast

---

[25] "[I]n the absence of such clarity of intent, Congress cannot be deemed to have significantly changed the federal-state balance." *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1328 (11th Cir. 2001) (quotation omitted); *see Chi., Milwaukee, St. Paul & Pac. R.R. Co. v. Illinois*, 355 U.S. 300, 305 (1958) ("[W]henever this federal power is exerted within what would otherwise be the domain of state power, the justification for its exercise must clearly appear." (quotation and internal citation omitted)); *Florida v. United States*, 282 U.S. 194, 211–12 (1931) ("[W]henever the federal power is exerted within what would otherwise be the domain of state power, the justification of the exercise of the federal power must clearly appear.").

economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302,

324 (2014) (quotation omitted); *see Whitman v. Am. Trucking Ass'ns*, 531 U.S.

457, 468 (2001) ("Congress . . . does not, one might say, hide elephants in

mouseholes."); *Brown & Williamson*, 529 U.S. at 160 ("[W]e are confident that

Congress could not have intended to delegate a decision of such economic and

political significance to an agency in so cryptic a fashion."). "[H]ad Congress

wished to assign [a] question [of deep economic and political significance] to an

agency, it surely would have done so expressly." *King v. Burwell*, 576 U.S. 473,

486 (2015).[26]  The CDC Order, by its own terms, affects as many as "30-40 million

people." 85 Fed. Reg. at 55,295 & n.17.  Because nothing in § 264(a) indicates

that Congress intended to assign the Director of the CDC sweeping authority over

the national rental housing market, the major questions doctrine supports this

interpretation of § 264(a).  *See Ala. Ass'n of Realtors*, 2021 WL 1779282, at *7.

Other courts have reached the same conclusions when addressing the scope

of the government's authority under § 264(a).  In *Tiger Lily*, the U.S. Court of

Appeals for the Sixth Circuit denied the government's request to stay a district

court ruling that found that the CDC Order exceeds the statutory authority of

§ 264(a).  992 F.3d at 520.  The Sixth Circuit held that "the terms of [§ 264(a)]

---

[26] "[T]he Supreme Court has repeatedly rejected agency attempts to take major regulatory action without *clear* congressional authorization." *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 420 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from the denial of rehearing en banc).

cannot support the broad power that the CDC seeks to exert" and that the CDC

Order "falls outside the scope of the statute." *Id*. at 522–23. Similarly, in a

separate case challenging the CDC Order, the U.S. District Court for the District of

Columbia concluded that the "broad grant of rulemaking authority in the first

sentence of § 264(a) is tethered to—and narrowed by—the second sentence," and

that the "other measures" authorized by the second sentence of § 264(a) "are

controlled and defined by reference to the enumerated categories before it." *See*

*Ala. Ass'n of Realtors*, 2021 WL 1779282, at *5 (quotation omitted); *see id*. at *6

("While it is true that Congress granted the Secretary broad authority to protect the

public health, it also prescribed clear means by which the Secretary could achieve

that purpose." (citing *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*,

466 F.3d 134, 139 (D.C. Cir. 2006))).

The U.S. District Court for the District of Columbia subsequently stayed its

own ruling, *see Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*,

No. 20-cv-3377, 2021 WL 1946376, at *1 (D.D.C. May 14, 2021), and the U.S.

Court of Appeals for the District of Columbia Circuit declined to vacate the stay,

*see Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, No. 21-5093,

2021 WL 2221646, at *2 (D.C. Cir. June 2, 2021). In its order declining to vacate

the stay, the D.C. Circuit found that the CDC Order "falls within the plain text of

42 U.S.C. § 264(a)" and thus disagreed with my interpretation of the statute. *See*

69

*id*. at *1–3.  In particular, the D.C. Circuit attempted to avoid the limiting function of the second sentence of § 264(a) by providing an alternative explanation for why Congress included that sentence in the statute.  *See id*. at *2.

According to the D.C. Circuit, we should ignore the plain text of the second sentence of § 264(a)—and its limiting function—because "Congress in 1944 had reason to believe [that the measures in the second sentence of § 264(a)] required express congressional authorization under the Fourth Amendment."  *Id*.  (citing *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 201 & n.27 (1946)).  In *Oklahoma Press Publishing*, the Supreme Court stated that "nothing short of the most explicit language would induce us to attribute to congress th[e] intent" to authorize an agency to engage in searches and seizures that implicate the "spirit as well as the letter of the Fourth Amendment."  327 U.S. at 201 n.27 (quotation omitted).  Thus, according to the D.C. Circuit, we should not construe the second sentence of § 264(a) as a limitation on the Director of the CDC's authority because Congress only included that sentence to address clear statement concerns.

But this argument proves too much.  Even if we recognized such an unexpressed, unenacted legislative intent—and agreed that it could override the plain text of § 264(a)—the D.C. Circuit's reasoning suffers from a fatal flaw.  If a clear statement is necessary in the second sentence of § 264(a) for us to conclude that Congress intended to authorize an agency to interfere with property rights—

70

such as a nationwide residential eviction moratorium[27]—that rule applies to the first sentence of § 264(a) as much as it applies to the second sentence. Thus, even applying the *Oklahoma Press Publishing* clear statement rule to § 264(a), the statute still does not authorize the CDC Order because it does not contain a clear statement authorizing the Director of the CDC to issue a nationwide residential eviction moratorium.

The Supreme Court recently declined to vacate the stay. *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, No. 20A169, 2021 WL 2667610, at *1 (June 29, 2021) (mem.). But four justices would have granted the application to vacate the stay. *Id.* A fifth justice wrote separately to indicate that he "agree[d] with the District Court and the applicants that the Centers for Disease Control and Prevention exceeded its existing statutory authority by issuing a nationwide eviction moratorium." *Id.* (Kavanaugh, J., concurring). Thus, five justices appear to agree that the CDC Order likely exceeds the statutory authority set out in § 264(a).

3.    Ratification

---

[27] *Cf. United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 49 (1993) (recognizing that the Fourth Amendment can apply to civil seizures of property); *Presley v. City of Charlottesville*, 464 F.3d 480, 486–87 (4th Cir. 2006) (applying the Fourth Amendment to seizures of real property—including temporary or partial seizures).

The government alternatively argues that the CDC Order was statutorily authorized because Congress ratified it in the Consolidated Appropriations Act of 2021 (the "Act").  It is well-settled that "Congress . . .  ha[s] [the] power to ratify the acts which it might have authorized." *United States v. Heinszen*, 206 U.S. 370, 384 (1907); *see Swayne & Hoyt v. United States*, 300 U.S. 297, 301–02 (1937).  But "mere acquiescence by . . . Congress [is] not . . . sufficient to constitute authorization." *Hannah v. Larche*, 363 U.S. 420, 438 (1960).  In the rare situations where "we have recognized congressional acquiescence to administrative interpretations of a statute . . . we have done so with extreme care." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 (2001).

The Act states:

> The order issued by the Centers for Disease Control and Prevention under section 361 of the Public Health Services Act (42 U.S.C. 264), entitled 'Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19' . . . is extended through January 31, 2021, notwithstanding the effective dates specified in such order.

134 Stat. at 2078–79.  But nothing in the Act "expressly approved the agency's interpretation." *Tiger Lily*, 992 F.3d at 524; *Ala. Ass'n of Realtors*, 2021 WL 1779282, at *9.  All the Act did "was congressionally extend the agency's action until January 31, 2021.  After that date, Congress withdrew its support, and the CDC could rely only on the plain text of 42 U.S.C. § 264, which, as noted, does not authorize the CDC Director to ban evictions." *Tiger Lily*, 992 F.3d at 524

72

(internal citations omitted); *see id*. ("[M]ere congressional acquiescence in the CDC's assertion that the . . . Order was supported by 42 U.S.C. § 264(a) does not make it so, especially given that the plain text of that provision indicates otherwise."); *Ala. Ass'n of Realtors*, 2021 WL 1779282, at *9.

Further, even if Congress ratified the CDC Order, it only did so through January 31, 2021, and the purported ratification cannot be the source of authority for the CDC's subsequent extensions of the Order. *See* 134 Stat. at 2078–79 ("The order . . . entitled 'Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19 . . . is extended through January 31, 2021, notwithstanding the effective dates specified in such order."). Thus, the CDC Order has not been statutorily authorized through Congressional ratification.

*        *        *

Because neither sentence of § 264(a) authorizes the CDC Order and Congress did not ratify it, the landlords have demonstrated a substantial likelihood of success on the merits of their claim that the Order exceeds statutory authority. *See* 5 U.S.C. § 706(2)(C) (stating that we must "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory . . . authority.").

C.    Irreparable Injury

The district court also abused its discretion in finding that the landlords failed to establish that they will suffer an irreparable injury unless an injunction is

73

granted. The landlords argue that they face irreparable injury because they "cannot recover any of the economic damages they continue to incur because tenants covered by the CDC Order, by definition, are insolvent—and thus judgment-proof."

In his affidavit, Krausz stated that:

> [his] tenant provided the South Carolina court with a declaration consistent with the CDC's September 4, 2020 eviction order, declaring that the tenant was unable to pay rent because of economic stress arising from the COVID-19 pandemic, had used best efforts to obtain available government assistance and was using best efforts to make timely partial payments that are as close to the full payment as possible, had no other home to go to, and was making less than $99,000 annually.

And at the evidentiary hearing, the landlords argued that the combination of the conditions of the CDC Order and "the fact that these individual tenants are all paying nothing . . . [amounts to] a declaration under oath that the best efforts that they can make because of their financial circumstances is zero payment."

Further, the landlords argue that they are continuing to accrue losses while the CDC Order is in place. For example, the terms of Krausz's lease agreement require his tenant to pay $700 in monthly rent. Absent the CDC Order, he would have a legal right to evict that tenant and "rent or use the property at a fair market value of at least $700 per month." Thus, the landlords seek not just to remedy past harms, but also to "staunch the flow of ongoing *future* losses." *See Askins & Miller*, 924 F.3d at 1359. And while the CDC Order is in place, the landlords are

74

"involuntary creditor[s]" who are being compelled to incur additional debts that they may never be able to collect. *See id*. (quotation omitted).

### 1.     Legal Principles

To obtain a preliminary injunction, the landlords must demonstrate that they face an irreparable injury. An injury is irreparable if the plaintiff does not have an adequate remedy at law. *See Askins & Miller*, 924 F.3d at 1358. To be adequate, a remedy at law must "be as complete, practicable, and efficient as that which equity could afford." *Boise Artesian Hot & Cold Water Co. v. Boise City*, 213 U.S. 276, 281 (1909).[28] "Doubts are to be resolved in favor of equity jurisdiction." 1 Fred F. Lawrence, A Treatise on the Substantive Law of Equity Jurisprudence, § 77, p. 113 (1929).

"[T]he collectability of a future money judgment to redress future harms is relevant in determining whether legal remedies are 'adequate.'" *Askins & Miller*, 924 F.3d at 1359; *see Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers) (internal citations omitted) ("Normally the mere payment of money is not considered irreparable, but . . . . [i]f expenditures cannot be recouped, the resulting loss may be irreparable."); *see also Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940) (holding that a preliminary injunction was

---

[28] *See* 4 John N. Pomeroy, A Treatise on Equity Jurisprudence, § 1338, p. 936 (5th ed. 1941) ("The incompleteness and inadequacy of the legal remedy is the criterion which, under the settled doctrine, determines the right to the equitable remedy of injunction.").

proper where "there were allegations that [the defendant] was insolvent"); *Scott*, 612 F.3d at 1295 ("An injury is irreparable if it cannot be undone through monetary remedies." (quotation omitted)).  In particular, a "likelihood that a defendant will never pay . . . [can] give rise to the irreparable harm necessary for a preliminary injunction." *Askins & Miller*, 924 F.3d at 1359 (quotation omitted).[29] A majority of the circuits agree.[30]  *See id*. ("[M]ost courts sensibly conclude that a

---

[29] *See* 5 John N. Pomeroy, A Treatise on Equity Jurisprudence, § 1911, p. 4340 (4th ed. 1919) ("The number of cases in which the question has arisen whether insolvency alone is enough to support an injunction is not so large, but is sufficient to show the general recognition by the courts of the glaring insufficiency of a judgment for damages against an insolvent."); 1 Dan B. Dobbs, Law of Remedies § 2.5(2), pp. 130–31 (1993) (noting that "[t]he legal remedy is usually inadequate" where money damages are "available but not collectible"); *see also* 11A Charles A. Wright et al., Federal Practice and Procedure § 2948.1 (3d ed. Apr. 2021 update) ("[E]xtraordinary circumstances, such as a risk that the defendant will become insolvent before a judgment can be collected, may give rise to the irreparable harm necessary for a preliminary injunction." (footnotes omitted)); Douglas Laycock, *The Death of the Irreparable Injury Rule*, 103 Harv. L. Rev. 687, 717 (1990) ("There is no reason for a court to stand aside while an insolvent inflicts harm for which he can never pay."); *cf*. 71 Am. Jur. 2d Specific Performance § 13 (1973) ("[E]ven if the defendant has a considerable amount of property, specific performance may be decreed if his or her solvency is problematical and doubtful.").

[30] *See Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999) ("[C]ourts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents."); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 206 (3d Cir. 1990) ("[T]he unsatisfiability of a money judgment can constitute irreparable injury"); *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) ("[I]rreparable harm may still exist where . . . damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected." (quotation omitted)); *Specialty Healthcare Mgmt., Inc. v. St. Mary Par. Hosp.*, 220 F.3d 650, 658 (5th Cir. 2000) ("There is some authority . . . for the proposition that an inability to actually collect on a money judgment may suffice to make an injury irreparable."); *Am. Hosp. Supply Corp. v. Hosp. Prod. Ltd.*, 780 F.2d 589, 596 (7th Cir. 1986) ("[A] defendant's insolvency is a standard ground for concluding that a plaintiff's harm if the preliminary injunction is denied will not be cured by an award of damages at the end of the trial."); *Hilao v. Est. of Ferdinand Marcos (In re Est. of Ferdinand Marcos, Hum. Rts. Litig.)*, 25 F.3d 1467, 1480 (9th Cir. 1994) ("[A] district court has authority to issue a preliminary injunction where the plaintiffs can establish that money damages will be an inadequate remedy due to impending insolvency of the defendant.");

damage judgment against an insolvent defendant is an inadequate remedy."

(quotation omitted)).

Although there may be "distinctions between insolvency in the sense of

inability to pay debts as they mature, insolvency in the sense of excess of total

liabilities over total assets and insolvency in the sense of an utter lack of leviable

assets . . . [t]hese variations indicate the range of doubtful collectability" and

"[d]oubt as to the probable effectiveness of the damage remedy weighs against the

relative adequacy of the remedy."[31]  Restatement (Second) of Torts § 944 cmt. i

(Am. L. Inst. 1979).  *Id.*  "To the extent that the damages awarded cannot be

realized upon execution, the damage remedy is proportionately inadequate."  *Id.*

The landlords had the burden to "clearly establish[]" that they would suffer

an irreparable injury unless an injunction was granted.  *Siegel v. LePore*, 234 F.3d

1163, 1176 (11th Cir. 2000) (quotation omitted).  Because the landlords' theory of

---

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986) ("Difficulty in collecting a damage judgment may support a claim of irreparable injury. . . . If Tri-State cannot collect a money judgment, then failure to enter the preliminary injunction would irreparably harm it." (internal citations omitted)); *Askins & Miller*, 924 F.3d at 1359 ("[M]ost courts sensibly conclude that a damage judgment against an insolvent defendant is an inadequate remedy." (quotation omitted)).

[31] Black's Law Dictionary defines "insolvent" as "having liabilities that exceed the value of assets; having stopped paying debts in the ordinary course of business or being unable to pay them as they fall due." *Insolvent*, Black's Law Dictionary (11th ed. 2019).  Like the district court, I acknowledge that there may be some play in the joints between this definition of insolvency and the concept of insolvency for the purposes of demonstrating irreparable injury. For purposes of this discussion, I use "insolvent" or "insolvency" to refer to a "likelihood that [the tenant] will never pay." *Askins & Miller*, 924 F.3d at 1359.

irreparable injury is based on their tenants' insolvency and the inadequacy of a future award of money damages, the landlords had the burden to clearly establish a "likelihood that [the tenants] will never pay."[32]  *See Askins & Miller*, 924 F.3d at 1359.

####    2.    The Tenants' Insolvency

The conditions of the CDC Order—to which the tenants swore under penalty of perjury—satisfy the landlords' burden to clearly establish a likelihood that their tenants will never pay.  *See* 85 Fed. Reg. at 55,293.  First, the tenant must "ha[ve] used best efforts to obtain all available government assistance for rent or housing." *Id*.  Second, the tenant must not exceed certain income thresholds.  *Id*.  Third, the tenant must be "unable to pay the full rent or make a full housing payment due to

---

[32] We have not specifically addressed what constitutes a "likelihood" in the context of the collectability of a future award of money damages.  In other contexts, courts have defined a "likelihood" as a "better than negligible chance." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998) (quotation omitted); *see Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc) (defining a likelihood as a "reasonable chance, or probability"); *cf. Park v. LaFace Records*, 329 F.3d 437, 446 (6th Cir. 2003) (defining "likelihood" in the Lanham Act context to mean "a 'probability' rather than a 'possibility.'"). *See generally Likelihood*, Oxford English Dictionary Online, https://www.oed.com/view/Entry/108313 (last visited July 7, 2021) (defining "likelihood" as "[t]he quality or fact of being likely or probable; probability; an instance of this").  Those courts have also stated that a likelihood is less than a "certainty," *Bath Indus. v. Blot*, 427 F.2d 97, 111 (7th Cir. 1970), and something less than "more likely than not," *see Singer*, 650 F.3d at 229.

Unlike the first prong of the preliminary injunction analysis, where the landlords were required to clearly establish a *substantial likelihood* of success, the irreparable injury prong only requires the landlords to clearly establish a *likelihood* that their tenants will never pay.  *See Askins & Miller*, 924 F.3d at 1359.

substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses." *Id*. (footnote omitted). Fourth, the tenant must be "using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses." *Id*. And fifth, eviction must "likely render the individual homeless—or force the individual to move into and live . . . in a new congregate or shared living setting—because the individual has no other available housing options." *Id*.

The landlords persuasively argue that the combination of these conditions—along with the fact that their tenants had paid nothing towards their monthly rent—demonstrates that their tenants are insolvent and that a future money judgment will not be collectable. Although the majority finds this evidence to be inadequate, I disagree, and believe that the third, fourth, and fifth conditions of the CDC Order particularly support this conclusion.

The third condition requires the tenant to be "unable to pay the full rent or make a full housing payment due to a substantial loss of housing income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses." Swearing to this condition means that the tenant is insolvent under traditional definitions of insolvency—they are unable to pay debts as they come due. *See Insolvent*, Black's Law Dictionary (11th ed. 2019).

79

The fourth condition requires the tenant to be "using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses." Here, the tenants have paid nothing. Because the tenants are required to use best efforts to make timely partial payments and have paid nothing, swearing to this condition means that the tenants have no available money, no discretionary expenses that can be cut back on, no illiquid assets that can be sold, and no ability to get a loan to cover rental expenses.[33]

---

[33] The majority objects to this reading of the CDC Order and insists that "best efforts" should be read to mean "best *reasonable* efforts"—that is, we should insert a word into the Order so that it comports better with what the government may have intended to say. This objection is misplaced for two reasons. First, such a reading would render the exception for "other nondiscretionary expenses" superfluous, because "best *reasonable* efforts" would necessarily account for the tenant's nondiscretionary expenses. Second, equity has a "general aversion to rules that let bad actors"—such as a government agency that issued an order exceeding statutory authorization—"capitalize on legal technicalities." *Askins & Miller*, 924 F.3d at 1359. The CDC has unlawfully interfered with the landlords' property rights and we should not distort the CDC Order in a way that allows the CDC to escape the consequences of its own actions.

In support of its reading, the majority cites several cases discussing "best efforts" clauses in contracts and concludes that "a business need not 'spend itself into bankruptcy' to comply with a best-efforts clause." But if making a $1.00 partial rent payment—which Krausz's tenant has been unable to make—would cause her to "spend [her]self into bankruptcy," she is clearly insolvent for purposes of evaluating irreparable injury here.

Regardless, my conclusion that the landlords sufficiently have demonstrated irreparable injury does not rely on the fourth condition alone. It is also based on the fifth condition, which requires the tenant to be "likely render[ed] . . . homeless—or force[d] . . . to move into and live in a new congregate or shared living setting—because [they have] no other available housing options." Even if a tenant who owns substantial illiquid assets—such as home furnishings, tools, electronics, or jewelry—would not be required to sell those assets to demonstrate "best efforts," they would be required to sell those assets before they could swear that they would be rendered "homeless . . . or force[d] to move into and live in a new congregate or shared living setting—because [they have] no other available housing options."

The fifth condition requires the tenant to declare that eviction would "likely render [them] homeless—or force [them] to move into and live in a new congregate or shared living setting—because [they have] no other available housing options." By swearing to this condition, the tenant is stating that they have insufficient means to pay rent for the cheapest "available, unoccupied residential property" that meets occupancy standards.[34]

Thus, the combination of the third, fourth, and fifth conditions of the CDC Order means that Krausz's tenant is unable to pay debts as they come due; has no available money, no discretionary expenses that can be cut back on, no illiquid assets that can be sold, and no ability to get a loan to cover rental expenses; and cannot afford to move to the cheapest available residential property that meets occupancy standards. These allegations are sufficient for Krausz to establish that his tenant is insolvent and that there is a likelihood that he will not be able to collect on a future money judgment. *See Askins & Miller*, 924 F.3d at 1359.

---

[34] The majority expresses doubt that the tenants could find alternative housing options because landlords might not "offer to lease their property to a tenant who is suffering from, for example, a substantial loss of household income." But the tenants have sworn that they have insufficient means to pay rent for the cheapest "available, unoccupied residential property" that meets occupancy standards. That property could be a mobile home, an extended-stay motel, or a studio apartment in the most run-down part of town. "Common sense," as the majority puts it, tells us that there are landlords who are willing to rent their properties for cash up front, without performing employment verifications or credit checks. And the tenants' declarations that they cannot even afford rent for these concededly undesirable housing options places an upper limit on the amount of assets that they could have.

A comparison of this case to *Town of Burlington v. Department of Education*, 655 F.2d 428 (1st Cir. 1981), is illustrative. In *Town of Burlington*, the Town argued that it would suffer an irreparable injury if it was forced to pay John Doe $7,400 for his son's education. The Town pointed to a statement Doe had made that indicated that "he would not have the full liquidity needed to litigate this case against a government body with comparatively unlimited financial assets," and argued that "it was hardly necessary to read between the lines; if the town pays out the money . . . its chances of ever seeing that money back if it prevails . . . are slim." *Id*. at 432–33 (quotations omitted). The U.S. Court of Appeals for the First Circuit disagreed. *Id*. at 433. It interpreted Doe's declaration to "imply either that the Does expected that their ability to match the Town's conduct of this litigation would be hindered by their own more pressing resource constraints, or that they would be forced to make undue sacrifices (such as liquidating major capital assets, like their home) to keep pace with the Town." *Id*. It also concluded that Doe's employment with "the federal government as a professional in a supervisory position" undermined the Town's argument that a future money judgment would not be collectable. *Id*.

This case is distinguishable on both counts. First, unlike Doe's vague statement in *Town of Burlington*, the tenants here have sworn, under penalty of perjury, to facts that amount to insolvency. Second, unlike Doe, who was

"employed by the federal government as a professional in a supervisory position," *id.*, the tenants here have suffered a "substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses" and are "unable to pay [their] full rent or make a full housing payment." CDC Order, 85 Fed. Reg. at 55,293 (footnote omitted). Thus, unlike the Town in *Town of Burlington*, the landlords have demonstrated a likelihood that a future money judgment will not be collectable.

The concurrence speculates about a tenant who "has a job that would allow for garnished wages in the event that a judgment is entered against her" but is "paying only 80% of her rent because she started a new, lower-paying job during the pandemic." According to the concurrence, the landlords have failed to carry their burden to demonstrate irreparable injury because this hypothetical tenant may "not [be] necessarily 'insolvent.'"

But the concurrence's hypothetical tenant is not a tenant in this case and we must focus on whether Krausz has demonstrated that *his* tenant is insolvent. Unlike the concurrence's hypothetical tenant, Krausz's tenant is not "paying . . . 80% of her rent." She is paying nothing. And although a tenant who is "paying only 80% of her rent" may not be insolvent, a tenant who is paying 0% of her rent, despite an obligation to use "best efforts to make timely partial payments," likely is insolvent.

Further, Krausz's rental property is in South Carolina and garnishment against his tenant is not an available remedy under South Carolina law.  *See* S.C. Code Ann. § 37-5-104 ("With respect to a debt arising from a consumer credit sale, a consumer lease, a consumer loan, or a consumer rental-purchase agreement, regardless of where made, the creditor may not attach unpaid earnings of the debtor by garnishment or like proceedings."); *see also In re Jordan*, 624 B.R. 147, 151 (Bankr. D.S.C. 2020) ("In South Carolina, garnishment is generally not permitted, except in a few limited circumstances."); *cf. id*. at 150–51 (noting that South Carolina also provides substantial exemptions for real and personal property from attachment, levy, and sale (citing S.C. Code Ann. § 15-41-30)); S.C. Code Ann. § 15-39-410 ("The judge may order any property of the judgment debtor . . . to be applied toward the satisfaction of the judgment, except that the earnings of the debtor for his personal services cannot be so applied.").  Thus, the possibility of garnishment does not defeat Krausz's showing of a likelihood that a future money judgment will not be collectable because garnishment is not available to him as a remedy.

The majority concedes that garnishment is not available to Krausz as a remedy.  But it speculates that Krausz could impose a levy on his tenant's cash or other liquid assets, or on her real estate or nonexempt personal property.  Beyond the fact that South Carolina law imposes substantial exemptions from attachment,

levy, and sale, *see* S.C. Code Ann. § 15-41-30(A)(1) (fifty-thousand-dollar exemption in real property); *id*. § 15-41-30(A)(2) (five-thousand-dollar exemption in a motor vehicle); *id*. § 15-41-30(A)(3) (four-thousand-dollar exemption in certain personal property); *id*. § 15-41-30(A)(4) (one-thousand-dollar exemption in jewelry); *id*. § 15-41-30(A)(5) (five-thousand-dollar exemption in liquid assets); *id*. § 15-41-30(A)(6) (one-thousand-five-hundred-dollar exemption for tools of the trade), the possibility that Krausz's tenant has cash or other liquid assets, or real estate or nonexempt personal property, in excess of these exemptions is foreclosed by the statements she made in her declaration.

The majority takes the position that a tenant "could attest to being unable to make timely payments despite best efforts without first pawning her wedding ring [and] . . . selling her car." But I do not believe that a tenant could swear to the conditions of the CDC Order while sitting on thousands of dollars of equity in jewelry and vehicles in excess of these exemptions.

In a similar vein, the district court faulted the landlords because they did "not present[] any evidence regarding collection measures that they have taken to ensure that the rent is paid or whether a legal tool, such as a levy or garnishment, would be unsuccessful in the event a judgment is entered at a later time"—or that their tenants "would unlawfully divert funds to avoid the payment of a judgment." It relied heavily on our opinion in *Askins & Miller* to conclude that the landlords

85

were required to present such evidence to demonstrate that they faced an irreparable injury.

In *Askins & Miller*, we reversed the district court's denial of the Internal Revenue Service's motion for a preliminary injunction against a company that was delinquent on employment taxes. 924 F.3d at 1351. The company argued that the IRS had an adequate remedy at law because it "could just wait for nonpayment and later seek a money judgment." *Id.* The IRS countered that, based on the company's previous actions, "the money [would] be long gone before the IRS [could] collect." *Id.* And, it argued, while it was attempting to collect the employment taxes, the company continued accruing new debts. *Id.* at 1352.

To support its contention that it would not be able to collect a future money judgment, the IRS presented evidence of "several collection strategies [it had tried] over the years." *Id.* First, the IRS attempted to "achieve voluntary compliance" by speaking with the company "at least 34 times . . . including 27 in-person meetings." *Id.* (quotation omitted). Then, when those measures failed, the IRS "employed more aggressive means" such as "serv[ing] levies on approximately two dozen entities," "assess[ing] trust fund recovery penalties" against the company's owners, "fil[ing] notices of federal tax liens," and suing both the company and its owners in federal district court. *Id.* at 1352–53 (quotation omitted). We held that the IRS adequately demonstrated irreparable injury for

86

purposes of a preliminary injunction.  *Id*. at 1361.  We noted that the IRS had demonstrated that the company had "a proclivity for unlawful conduct, had diverted and misappropriated the employment taxes it had withheld from its employees' wages, and was likely to continue ignoring its employment tax obligations."  *Id*. at 1360 (quotation omitted).  We also noted that the IRS was "an involuntary creditor" and that "[a]s long as the [company] continue[d] to accrue employment taxes, the IRS continue[d] to lose money."  *Id*. at 1359.  The fact "that the IRS [was] attempting to avoid *future* losses" was "key" to our decision that the IRS was entitled to a preliminary injunction.  *Id*. at 1359.

Although the district court noted that the landlords here are similarly positioned to the IRS in *Askins & Miller*—because they sought "injunctive relief to protect against future losses (the non-payment of rent during the time the Order is in place)—it found that the landlords failed to "present[] any evidence regarding collection measures that they have taken to ensure that the rent is paid or whether a legal tool, such as a levy or garnishment, would be unsuccessful in the event a judgment is entered at a later time."  It also put great weight on its finding that the landlords "presented no evidence that their tenants, like the defendants in *Askins & Miller*, would unlawfully divert funds to avoid the payment of a judgment."

The concurrence also relies heavily on the fact that the landlords "have presented no evidence that writs of execution, garnishment, or other methods of

87

executing on a judgment would be unsuccessful; . . . no evidence of their efforts to collect unpaid rent; and no evidence that the tenants failed to pay rent prior to the pandemic." Although we relied on these factors in *Askins & Miller* to determine that the IRS had demonstrated irreparable injury for purposes of a preliminary injunction, we did not hold that a plaintiff must demonstrate prior collection efforts to obtain such relief. Instead, we discussed the IRS's prior collection attempts because they supported the IRS's argument that it would not be able to collect a future judgment. Beyond the fact that the IRS has more time, resources, and legal authorities to compel a debtor to pay their obligations than a private landlord does, *Askins & Miller* does not set a floor for demonstrating irreparable injury. Instead, it holds that we must ask whether the plaintiff has demonstrated a "likelihood that a defendant will never pay." *Id*. at 1359. Because the landlords here made such a showing, *Askins & Miller* does not undermine their claims of irreparable injury.

The district court also faulted the landlords for not introducing evidence about:

> the occupation of any of the tenants, whether they are employed or unemployed (and, if unemployed, their prospect for reemployment), whether they are (or have been) sick, whether they have money in the bank, whether they qualify for some type of government assistance, whether they could obtain a loan to cover their rent or the nature of their credit histories.

88

The concurrence similarly faults the landlords because, in its view, they presented "no evidence of their tenants' employment prospects . . . [and] no evidence of their tenants' assets." But this criticism is misplaced for three reasons.

*First*, the tenants' declarations already answer several of these questions. The district court criticized the landlords for not producing evidence of whether the tenants "have money in the bank, whether they qualify for some government assistance, [or] whether they could obtain a loan to cover their rent or the nature of their credit histories." But the first condition of the CDC Order—that the tenant already had "used best efforts to obtain all available government assistance for rent or housing"—answers the district court's question of whether the tenants could avail themselves of government assistance. *See* 85 Fed. Reg. at 55,293. And the fourth and fifth conditions of the CDC Order—that the tenant is "using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit" and that the tenant has no "other available housing options"—squarely foreclose the district court's unsupported conjecture that the tenants might "have money in the bank" or "could obtain a loan to cover their rent." Those conditions also resolve the concurrence's concern that the tenants might have available assets. *Id*. The tenants' declarations—stating that they already had been using best efforts to make timely partial payments—along with the fact that the tenants had made no payments, exclude the possibility that

89

the tenants have money in the bank, the ability to obtain a loan to satisfy a future money judgment, or available assets.

*Second*, our precedent does not require the landlords to provide evidence of these matters. Instead, we have emphasized "the practical nature of the equitable inquiry" and have framed the inquiry as whether the plaintiffs have demonstrated "a likelihood that a defendant will never pay." *Askins & Miller*, 924 F.3d at 1359. Unlike the Court in *Askins & Miller*, we do not have to piece together evidence to determine whether the tenants are insolvent. We have declarations by the tenants where they swear, under penalty of perjury, to facts that amount to insolvency. Thus, the district court erred by faulting the landlords for failing to produce this evidence and by placing too high a burden on the landlords.

*Third*, speculation about the tenants' future job prospects does not defeat the landlords' showing of a likelihood that they will not be able to collect a future judgment. Based on the conditions of the CDC Order, we know that the tenants are unable to pay debts as they come due; have no available money, no discretionary expenses that can be cut back on, no illiquid assets that can be sold, and no ability to get a loan to cover rental expenses; and cannot afford to move to the cheapest available residential property that meets occupancy standards. The tenants are insolvent and "most courts"—including this Court—"sensibly conclude

90

that a damage judgment against an insolvent defendant is an inadequate remedy." *Askins & Miller*, 924 F.3d at 1359 (quotation omitted).

The district court's and the concurrence's speculation about the tenants' future job prospects is just that—speculation. They would have us play hiring manager and guess whether the tenants are likely to receive job offers, promotions, raises, or additional shifts based on their occupation or current employment status. "But future employment. . . [and] future health . . . [are] matters of estimate and prediction." *Norfolk & W. Ry. Co. v. Liepelt*, 444 U.S. 490, 494 (1980). There is no formula into which we can plug a tenant's occupation and current employment status and reliably predict their future job prospects.

In other contexts, we regularly "reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)." *United Transp. Union v. I.C.C.*, 891 F.2d 908, 912 (D.C. Cir. 1989); *see Brewer v. Ham*, 876 F.2d 448, 455 (5th Cir. 1989) ("Courts do not adjudicate with crystal balls."); *cf. Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) ("Predictions of future growth . . . will almost always prove to be wrong in hindsight."). The district court and the concurrence ask us to speculate— to imagine that there is some occupation or current employment status that can reliably predict future success and defeat the landlords' showing of a likelihood that they will not be able to collect on a future money judgment. But the

91

uncertainty surrounding the tenants' future job prospects, on top of "the uncertainty about the future course of the pandemic," *Cassell v. Snyders*, 990 F.3d 539, 546 (7th Cir. 2021), counsels against indulging in such speculation.

Further, the landlords do not ask us to speculate. They have come to court with rather remarkable declarations from their tenants where the tenants swear to facts that amount to insolvency. As in *Askins & Miller*, "[t]he fact that the [landlords are] attempting to avoid *future* losses is key." *Id*. We cannot demand that the landlords continue to incur further debts from insolvent tenants based on even the most well-reasoned speculation about the tenants' future job prospects.

Finally, the government argues that the collectability of a future money judgment is "undermined by Congress's recent appropriation of billions of dollars of rental assistance" to landlords and tenants.[35] In December 2020, Congress appropriated $25 billion in emergency rental assistance. *See* 134 Stat. at 2069–78. And in March 2021, Congress appropriated another $21.5 billion in emergency rental assistance, for a total of $46.5 billion. 135 Stat. at 54–58. The government argues that the availability of these funds defeats the landlords' showing of a

---

[35] In general, the record on appeal is limited to the record before the district court. *See* Fed. R. App. P. 10(a). *See Selman v. Cobb Cnty. Sch. Dist.*, 449 F.3d 1320, 1332 (11th Cir. 2006); *see also Turner v. Burnside*, 541 F.3d 1077, 1086 (11th Cir. 2008) ("We do not consider facts outside the record.").

likelihood that a future money judgment will be uncollectable.  I disagree for two reasons.

*First*, the government has provided no argument or evidence that the landlords are *entitled* to receive these funds—it has just pointed to the funds' existence.  At the evidentiary hearing, the government stated that it "couldn't speak to" the issue of whether the landlords were entitled to receive government funds.  Thus, at this point, it is speculative whether the landlords are entitled to these funds and whether the funds will remedy their injuries.

*Second*, the government has not demonstrated that the funds are adequate to remedy the landlords' injuries.  By its own terms, the CDC Order affects as many as "30-40 million" renters.  85 Fed. Reg. at 55,295 & n.17.  Dividing the $46.5 billion in appropriated funds among thirty million renters yields $1,550 per renter.  Krausz has asserted that he suffered damages greater than that amount from his tenant—that he was owed $2,265—as of September 2020.[36]  As a result, the

---

[36] The landlords may have incurred further damages during the pendency of this litigation.  For example, Krausz filed his declaration on September 17, 2020—approximately two weeks after the CDC Order was issued—and stated that his tenant owed "a monthly rent of $700."  If his tenant has not made any payments during this litigation, Krausz could have accrued more than $5,600 (eight months) in damages in unpaid rent alone.  This amount of per-renter damages would dwarf the amount of funds that Congress has appropriated.

Facts about the landlords' continued accrual of damages are not part of the record in this appeal.  This discussion merely demonstrates why the government cannot simply point to Congress's recent appropriations of rental assistance funds to defeat the landlords' showing of a likelihood that a future money judgment would be uncollectable.

government has not demonstrated that Congress has provided enough funding to remedy the landlords' financial harms.

Accordingly, Congress's appropriation of rental assistance funds does not defeat the landlords' showing of a likelihood that a future money judgment will be uncollectable.

*    *    *

Because the landlords have demonstrated that their tenants are insolvent and that a future money judgment is not likely to be collectable, the landlords have demonstrated that they face an irreparable injury absent an injunction. *See Askins & Miller*, 924 F.3d at 1359.

D.    Balance of the Harms and Public Interest

Finally, the district court abused its discretion in finding that the balance of the harms and the public interest favor maintaining the CDC Order. The district court found that the landlords' economic harms were outweighed by the potential loss of lives that the government has argued could occur if the Order is found to be unlawful. But in doing so, the district court failed to balance the harms and assess the public interest correctly.

"[A]s a general rule, American courts of equity did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 138 S. Ct. 2392, 2427 (2018) (Thomas, J., concurring); *see Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600

94

(2020) (Gorsuch, J., concurring in the grant of stay) ("Equitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit."); *see also* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 471 (2017).  Although the landlords requested "a preliminary injunction prohibiting [the government] from enforcing the CDC Order," the district court was not required to "grant the total relief sought by the applicant."  *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (quotation omitted).  Instead, it could "mold its decree to meet the exigencies of the particular case."  *Id*. (quotation omitted); *see Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1563 (11th Cir. 1988) ("The decision whether to grant equitable relief, and, if granted, what form it shall take, lies in the discretion of the district court.").

In addition to weighing the landlords' economic harms against "the significant loss of lives that . . . could occur should the Court block the Order," the district court also should have weighed the landlords' harms against the consequences that could occur if the government was unable to enforce the CDC Order against these specific landlords.  The government has not demonstrated that allowing a handful of evictions to go forward would cause any loss of life, let

95

alone the massive loss of life it has claimed could happen if the Order is invalidated nationwide.[37]

Further, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id*. (quotation omitted); *see Brown & Williamson*, 529 U.S. at 125 ("Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." (quotation omitted)); *cf. E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 985 (9th Cir. 2020) (noting "the public interest in ensuring that statutes enacted by [Congress] are not imperiled by executive fiat" (quotation omitted)); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest.").

The district court's contrary finding was premised, in part, on its earlier conclusions that the landlords had failed to show a substantial likelihood of success on the merits or irreparable injuries. Although "[a]n injunction . . . does not follow

---

[37] The scope and existence of the CDC's lawful authority under § 264(a) bears on the balance of the harms because the CDC has the power to enact substitute measures to address the threat of COVID-19. *See* 42 C.F.R. § 70.2; *see also* 42 U.S.C. § 264(a), (d).

96

from success on the merits as a matter of course," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008), our conclusions to the contrary—that the landlords have demonstrated a substantial likelihood of success on the merits and an irreparable injury—tilt the scales in the landlords' favor, *see Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) ("A party's likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest." (quotation omitted)). Thus, the balance of the harms and the public interest favor granting the landlords' request for a preliminary injunction.

## IV. Conclusion

The district court abused its discretion in denying the landlords' motion for a preliminary injunction because the landlords established a substantial likelihood of success on the merits, that they will suffer irreparable injury absent an injunction, and that the balance of the equities and the public interest favor an injunction. Because the majority reaches the opposite conclusion, I respectfully dissent.